Beatrice D. Marony et al., Suing on Behalf of Themselves and All Other Stockholders of New York Transit Company Similarly Situated, Appellants-Respondents, v. Paul R. Applegate et al., Respondents-Appellants, and John D. Rockefeller, Jr., et al., Respondents.

First Department, June 22, 1943.

*Louis Boehm* of counsel (*Bernard D. Fischman* and *Robert L. Boehm* with him on the brief; *Boehm & Zeiger,* attorneys), for appellants-respondents.

*Theodore Kiendl* of counsel (*Ralph M. Carson* and *Francis W. Phillips* with him on the brief; *Davis Polk Wardwell Gardiner & Reed,* attorneys), for respondents-appellants.

*Timothy N. Pfeiffer* of counsel (*Milbank, Tweed & Hope,* attorneys), for respondent John D. Rockefeller, Jr.

*Chauncey Belknap* of counsel (*John V. Duncan* with him on the brief; *Curtis & Belknap,* attorneys), for respondents Rockefeller Foundation, Winthrop W. Aldrich and Walter W. Stewart.

*John J. Manning* of counsel (*William DeL. Mangan* with him on the brief; *George V. Holton* and *John J. Manning,* attorneys), for respondent Socony-Vacuum Oil Company, Incorporated.

*George L. Trumbull* of counsel (*Bertram F. Shipman* and *Jesse G. Heiges* with him on the brief; *Mudge, Stern, Williams & Tucker,* attorneys), for respondents Northern Pipe Line Company and Indiana Pipe Line Company.

CALLAHAN, J.  These are cross appeals from a judgment in a derivative action brought by minority stockholders of New York Transit Company.

New York Transit Company was one of a group of four companies operating a continuous pipe-line system for the transportation of crude oil from western Indiana to Buffalo, New York.  The system was commonly known as the "Northern Group" of pipe-line companies.  The portion of the system in Ohio and Michigan was operated by the Buckeye Pipe Line Company.  The portion of the system in Indiana was operated by defendant Indiana Pipe Line Company.  The portion of the system crossing northwestern Pennsylvania was operated by the defendant, Northern Pipe Line Company.  The New York Transit Company operated the remainder of the system from a point on the Pennsylvania-New York border near Olean, N. Y., to Buffalo, N. Y.  In mileage, volume of transportation and in most other respects the Buckeye and Indiana corporations were considerably larger than Northern and New York Transit.  Buckeye was the largest, and the New York Transit the smallest of the group.

Defendant Socony-Vacuum Oil Company had a refinery at Buffalo, N. Y.  For most of the period involved it was the sole outlet for the crude oil transported through the lines of New York Transit.

Buckeye and New York Transit, in addition to the transportation lines, had gathering lines in their respective territories.  All companies other than New York Transit had more than one outlet for their crude oil.

The four companies in the Northern group were formerly controlled by Standard Oil Company of New Jersey, but were separated therefrom when that company was dissolved by judicial decree in 1911.  Twenty-five per cent of the capital stock in each of the four companies in the group was owned by the Rockefeller Foundation, having been in its hands since the dissolution of Standard Oil Company of New Jersey.

Defendants John D. Rockefeller, Jr., Winthrop W. Aldrich and Walter W. Stewart are members of the finance committee of the Rockefeller Foundation.  They were named as defendants herein because they voted the stock owned by Rockefeller Foundation, and (allegedly) thereby controlled the companies in the

group. The stockholders of New York Transit Company, other than Rockefeller Foundation, have no stock interest in any other company in the group.

The defendants Paul R. Applegate, Douglas S. Bushnell, Jenner R. Fast, Chester H. Cleaver and Edward M. Welsh were officers and directors of New York Transit.

Plaintiffs claim to own twenty-eight per cent of the total stock of New York Transit.

As the complaint herein was first framed, it contained two distinct claims: (1) to recover damages for conspiracy based on alleged discrimination against New York Transit in the division of joint rates charged for transportation of crude oil by the Northern Group; and (2) a cause of action against defendant directors for alleged waste of corporate assets, and to compel them to repay moneys allegedly improperly charged against New York Transit in the allocation of its share of expenses of the group. The acts complained of were alleged to have occurred during the years from 1930 to 1940, inclusive. Upon the trial at Special Term, the complaint was amended so that these two claims were separately pleaded. The first claim, omitting the charge of conspiracy, was set forth as a supplemental complaint, the second claim remaining as the original complaint. The trial court dismissed the supplemental complaint based on the alleged discriminatory division of rates. Plaintiff appeals from such dismissal.

The trial court awarded a judgment in favor of the plaintiffs in the sum of $11,409.44 on the second claim (which remained as the original complaint) based on the alleged improper allocation of expenses. Defendant directors appeal from that judgment.

Both of the groups mentioned appeal from the allowances made to their respective counsel by the trial court under section 61-a of the General Corporation Law.

The basis of the dismissal of the supplemental complaint was the ruling by Special Term that the court had no jurisdiction of the subject matter of the action insofar as it concerned a division of joint rates, because sole authority to determine the reasonable and fair division of pipe-line rates was in the Interstate Commerce Commission.

Plaintiffs opposed the motion to dismiss upon numerous grounds. They conceded, however, that no complaint had been made to and no ruling secured from the Interstate Commerce Commission with respect to the unfairness of the division of rates between the companies in the Northern Group.

Under the circumstances and upon controlling authority we deem that the ruling of Special Term dismissing the supplemental complaint was correct.

Whether, strictly speaking, the case is one of lack of jurisdiction of the subject matter of the action, or rather lack of jurisdiction to determine a basic fact in the action, is immaterial. The attack, in any event, is upon jurisdiction of this court over what is an essential part of the subject matter of plaintiffs' cause of action.

It is clear that, under the authorities, the Interstate Commerce Commission has sole authority to decide what are reasonable rates for the transportation of oil by pipe-line companies, and as to the fair division of the joint rate between participating carriers in such an enterprise.

The Interstate Commerce Act (U. S. Code, tit. 49, § 1, subd. [4] and § 15, subd. [6]) provides, in substance, for the fixing of joint rates by carriers, and provides that the Commission shall by order prescribe the just, reasonable and equitable division thereof between the several carriers involved where joint rates are concerned. An order when made by the Commission under this statute is effective only for a period subsequent to the filing of a complaint.

Such a determination by the Commission is primarily an administrative or legislative function rather than a judicial function. Though, of course, the Supreme Court of this State had jurisdiction of actions for constructive fraud against directors and those conspiring with them, no relief could have been granted to plaintiffs as against the present defendants, without a determination of the preliminary question of what division of rates would be fair and reasonable. Under the statute cited, such an issue has been reserved solely for the Interstate Commerce Commission.

Before complaint can be made in any court concerning a rate charged by a carrier over which the Interstate Commerce Commission has jurisdiction, a rule must first be obtained from the Commission that the rate is unfair. (*Texas & Pac. Ry.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426; *Great Northern Ry.* v. *Merchants Elev. Co.,* 259 U. S. 285; *Board of Railroad Comrs.* v. *Great Northern Ry.,* 281 U. S. 412.) A similar requirement exists concerning the division of joint rates. (*Tap Line Cases,* 234 U. S. 1; *United States* v. *Abilene & So. Ry. Co.,* 265 U. S. 274; *B. & O. R. R. Co.* v. *United States,* 298 U. S. 349.) These rules apply to pipe-line companies as well as other carriers. (*Pipe Line Cases,* 234 U. S. 548. See, also, U. S. Code, tit. 49, § 1, subd. [1], par. [b], and subd. [3].)

That the rules conferring exclusive jurisdiction on the Interstate Commerce Commission for division of rates prevent the granting of relief in a minority stockholders' derivative action seeking to charge directors with liability for failure to secure a favorable apportionment for their company, was expressly held in *Backus-Brooks Co.* v. *Northern Pac. Ry. Co.* (21 F. 2d 4, 15). There the United States Circuit Court of Appeals for the Eighth Circuit said: " The preliminary and fundamental inquiry is, what is a reasonable and just division? This preliminary and fundamental question the Commission alone may determine.''

Plaintiffs attempt to avoid the force of the decisions referred to by pointing out that this is an action against directors for unlawful conspiracy resulting in mismanagement and waste of corporate funds. They cite the case of *Meeker* v. *Lehigh Valley R. Co.* (183 F. 548, C.C.A. 2nd Circuit, 1910) as authority for the rule that a plaintiff injured by an unlawful conspiracy cannot be defeated in his right to redress by the provisions of the Interstate Commerce Act requiring shippers first to resort to the Commission for relief against excessive freight charges. The *Meeker* case (*supra*), however, is distinguishable in that the right to the relief sought by the plaintiff therein was expressly granted to him by another and later statute. Thus the applicable statutes read together expressly gave the right of action which the plaintiff in the *Meeker* case (*supra*) sought to enforce. Here the remedy which plaintiffs seek is not expressly granted to them by statute. Although the common-law rights of litigants were preserved under section 22 of the Interstate Commerce Act (U. S. Code, tit. 49, § 22), it has been expressly held that this reservation does not give a common-law court jurisdiction to fix rates in direct proceedings for that purpose; nor may it do so collaterally when the action is based on the claim that unreasonable allowances have been paid. (*Texas & Pac. Ry.* v. *Abilene Cotton Oil Co.* (*supra*); *Mitchell Coal Co.* v. *Pennsylvania R. R. Co.*, 230 U. S. 247.)

The *Meeker* case (*supra*) is further distinguishable from the present case in that here the wrong charged rests solely on an improper division of rates, whereas in the *Meeker* case such matter was only a single step in a conspiracy of much broader scope. Though we do not consider the absence or presence of a charge of conspiracy to be controlling on this question, in passing we note that the supplemental complaint, after the amendment of the pleadings on the trial, omitted any charge of conspiracy concerning the improper division of rates.

It might be well also to call attention to the fact that the force of the rule in the *Meeker* case (*supra*) would seem to have been weakened by later rulings of the Supreme Court of the United States. In *Keogh* v. *C. & N. W. Ry. Co.* (260 U. S. 156) and in *Terminal Warehouse* v. *Penn. R. Co.* (297 U. S. 500) it was held that the Federal Anti-Trust Act, which provided a statutory right of legal action, did not afford a remedy by action based upon discriminatory rates if the case were one where relief with respect to such rates must be sought before the Interstate Commerce Commission.

The contention of the plaintiffs that section 15, subdivision (6), of the Interstate Commerce Act has no application to division of rates between companies having a common management is without force. This contention was adequately discussed by the court at Special Term and we see no need of adding further to that discussion.

The further contention of plaintiffs that section 15, subdivision (6), does not confer jurisdiction upon the Commission to determine the fairness of a division of rates occurring prior to a complaint, and that, therefore, the right is reserved to litigants to proceed at common law as to any such earlier division, has no application to the facts involved herein. In those cases where a right of action was upheld as to matters occurring prior to the Commission's assumption of jurisdiction, the Commission had eventually determined the question of fair division from a fixed date, and, therefore, that basic issue had been adjudicated by the Commission.

Assuming that the courts have the power under the circumstances last noted to give relief for events which antedated a ruling by the Commission, this right could not aid plaintiffs, for no complaint has as yet been made to the Commission in the present case.

Without citing the reported decisions at length, we may add that the cases considering this question as to the right to determine claims antedating action by the Commission have not been uniform in their rulings. The Circuit Court decisions relied on by plaintiffs were not followed in other Circuits.

Plaintiffs further contend that even if we assume that prior action by the Interstate Commerce Commission fixing a fair division of rates is a necessary preliminary step before common law relief may be obtained, the proper procedure was for the trial court to stay the trial of this action until such preliminary requirements might have been met, rather than to dismiss the complaint.

While there might be situations where a stay would properly be granted, we cannot say that it was error for the trial court to refuse to grant a stay in the present circumstances. No application to the Commission having been made in this case as to the division of the rates concerned, there was no basis upon which this court might proceed in an action with any assurance that the right to such relief might be secured.

Even if we assume that a stay of the action might have been proper if objection to jurisdiction had not been raised until after the trial had been completed (see *Tank Car Corp.* v. *Terminal Co.*, 308 U. S. 422), or the case partially tried (*Mitchell Coal Co.* v. *Pennsylvania R. R. Co., supra*), it would not follow that the imposition of a stay would be justified where, as here, a motion to dismiss the complaint was made to the Trial Justice before the trial had commenced.

In the *Mitchell* case (*supra*) it was held that, owing to the peculiar facts of that case, the unsettled law at the time suit was begun, and the failure of the defendant to make the jurisdictional point *in limine,* dismissal would be stayed so that plaintiff might proceed before the Commission. We deem the action so taken a matter of discretion. We do not have like facts in this case requiring a like exercise of discretion.

This brings us to the last contention of plaintiffs on their appeal, which is that the objection to jurisdiction based on lack of preliminary action by the Commission was not timely made, in that no plea had been made in the answer raising this contention as an affirmative defense. We are constrained to hold that the objection was timely, nevertheless. The substance of the objection is that, at the present time and upon the present facts, this court has no jurisdiction of the subject matter of this action. An objection to jurisdiction of the subject matter may be urged at any step of the trial or even, for the first time, upon appeal. (*Robinson* v. *Oceanic Steam Nav. Co.,* 112 N. Y. 315.)

No complaint based on intrastate carriage or the rate charged therefor is involved herein. A determination by the Interstate Commerce Commission of what would be a fair division of joint

interstate rates would be a necessary preliminary step to holding any of these defendants liable.

We determine that the supplemental complaint was properly dismissed as to all defendants. Upon plaintiffs' appeal the judgment should be affirmed.

Upon the appeal by the defendant directors from the judgment against them the case is a somewhat unusual one in that the decisions made by the directors, which are the subject of criticism, concerned questions as to division or apportionment of joint expenses arising out of the maintenance of common offices by four companies which are largely interdependent. Continuance of such joint management concededly was advantageous not only to the other three companies, but to New York Transit as well. In fact, New York Transit, being the smallest company, probably received the greatest advantage from joint management.

The four companies constituting the Northern Group had common executive officers, and maintained a joint central office, sharing salaries and various other expenses connected with their joint enterprise. However, each company maintained a separate field staff at its own expense. The parties were in agreement, and the trial court found that this sharing of executive expenses was mutually advantageous to all companies.

Each company had a separate board of directors, except that the joint president was a member of all four boards. At one time, when a change in presidents was imminent, both the outgoing and incoming presidents were common directors for a period of a little more than a year. At no time was there a majority of directors in any company who were common directors in any other company in the group. There was, however, such a majority who were officers of the other companies.

The trial court further found that, because of the geographical location of the respective companies and the fact that their pipe lines formed one continuous system which was essential to all to a large extent, they should be operated as a single enterprise; that as to its general phases the management could not be readily divided.

Furthermore, it clearly appeared, and the trial court likewise found, that each of these companies in the Northern Group was largely dependent on the other as a connecting carrier for the supply of oil, the through movement thereof and for outlets to points of delivery.

As the trial court stated in its opinion, a situation such as the one encountered here is not a common one, and the more

usual cases where directors served two corporations which had entirely conflicting rather than mutual interests are not analogous. The parties to this branch of the appeal agree that the general rule is ·that, in the absence of any conflict of interests, if a matter of corporate business is decided by the directors as the result of honest business judgment, courts will not interfere with their conduct of the corporate affairs.

Here there was no fraud or bad faith. The trial court expressly so found. Concededly the present directors obtained no personal profit or advantage from the transactions complained of. The trial court merely determined that in allocating joint expenses the directors did not prorate them as the circumstances required, based on what the court considered an equitable apportionment thereof. The directors in making the decision as to apportionment were not in the position of fiduciaries favoring their own interests to the detriment of their beneficiaries. While it was true that the prorating of expenses involved some conflict in financial interests as to the separate companies involved, at the same time it was necessary to have any division of expenses mutually satisfactory to all companies where one was dependent upon the other, and where the continuance of joint management was desirable for business subsistence. Considering all the elements in the case, we think that the "business judgment" rule would, under such circumstances, be controlling. The trial court apparently deemed this to be so, for it found that the directors did not exercise their reasonable business judgment in determining the portion to be paid by New York Transit of the salaries and other general expenses of the companies in the Northern Group.

But assuming that under the present circumstances the stricter rule, that where directors are serving conflicting interests their dealings are subject to close scrutiny, was to be applied, we think that the directors here have met any burden such a rule would place upon them. In applying such scrutiny, a court would be required to take into consideration all of the business considerations involved which might ameliorate or otherwise affect any conflict of interests. We think that the proper rule to be applied here may be put concretely by stating that if the directors of New York Transit showed they were guided by the financial necessities of the situation, and not by any ulterior motive, and were attempting to serve faithfully the interests of their own company, and not merely to serve the financial necessities of the other companies in the group to the detriment of New York Transit, they should be protected in their actions and decisions.

*Gamble* v. *Q. C. W. Co.* (123 N. Y. 91, 99) sets forth the rule to be applied in determining when matters of corporate management are to be subjected to judicial control: "To warrant the interposition of the court in favor of the minority shareholders in a corporation or joint-stock association, as against the contemplated action of the majority, where such action is within the corporate powers, a case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences to the company and in a manner inconsistent with its interests."

The rule concerning the test as to the propriety of acts relating to common management is briefly stated by CARDOZO, J., in *Globe Woolen Co.* v. *Utica G. & El. Co.* (224 N. Y. 483), where he said: "There must be candor and equity in the transaction, and some reasonable proportion between benefits and burdens."

The modification by the trial court of the division of expenses fixed by the directors was confined to four items of joint expenses: (a) the rental of the common offices used by the four companies; (b) the rental of a leased telegraph wire employed for the business of the four companies; (c) the cost of stationary and supplies used by the joint offices, and (d) the salaries and wages of common executive officers and other common employees of the Northern Group.

The allocation of such expenses complained of covered the eleven-year period from 1930 to 1940, inclusive. The trial court modified the allocation of expenses made as against New York Transit for the years between 1935 and 1939. To illustrate what the judgment appealed from did in the way of changing allocations made by the directors, we may consider the following items: the New York Transit had paid from 5% to 6.7% of the office rent and rental charge of the telegraph wire between 1930 and 1935, inclusive. The directors required it to pay 10% thereof from 1936 to 1939, inclusive, and then in 1940 reduced this to 5.42%.

During a ten-year period from 1930 to 1939, inclusive, New York Transit had paid from 5.45% of the salary of the president of the Northern Group to 8.21% thereof, whereas from 1935 to 1938, inclusive, it paid between 10.3% and 12.28% thereof.

As to the salary of the vice-president, New York Transit paid from 4.15% to 6.5% thereof between 1930 and 1935, whereas

between 1936 and 1938 it paid 10.15% thereof, which amount was reduced in 1939 and 1940.

As to office help other than executives, the proportion paid by New York Transit of these salaries during this eleven-year period ranged between 5% and 6.7%, except that in 1936 it was raised to 10%.

There were other instances where increases approved by the directors during the same period were held to be improper, but those cited will serve to illustrate the matters concerning which the court acted.

What the judgment in plaintiffs' favor did was to reduce the percentage of joint expenses charged to New York Transit for rent of office and telegraph wire to 5.42% during the years from 1936 to 1939 from the 10% charged against it by the directors. It made similar reductions where other expense items exceeded what the court decided was a fair percentage to charge. It required the directors to reimburse New York Transit to the extent that the court reduced the allotments. The trial court assumed that during the years from 1936 to 1939, 5.42% was a proper figure for such items for the years involved. It fixed a like percentage as to office supplies.

As to the salaries paid office clerks and similar employees, the court fixed 5% as the fair share to allot to New York Transit during the years mentioned.

As to the salaries of executive officers, the trial court found that the latter were employed on business which was common to all four companies, and all four derived benefits from their work. It determined (though conceding the matter was quite conjectural) that about two thirds of the time was devoted to common affairs of the group, and the balance to individual affairs of each company. It stated that nothing indicated that in the individual activities of each company more attention was required by one company than by another. The court found from figures disclosed by tabulations set forth in exhibits in the case that New York Transit's share of the business of the joint enterprise represented 4½% thereof, and that on this basis it received 11¼% of the services rendered by the officers. It found that in certain years the percentage charged against New York Transit as to the president's salary was above this figure and charged the directors with the excess.

All these findings were made despite a further finding that the amount of time and responsibility required of the executive officers of New York Transit could not fairly be measured in

exact proportion to its relative size and position in comparison to the other companies.

As regards the secretary and treasurer, the court found that the percentages paid to these officers appeared reasonable. It found a slight excess during certain years to certain other officers, and again charged this excess to the directors.

It will thus be seen that the trial court attempted to apply arbitrary mathematical formulae to the fixation of some salaries, and in most instances applied the same mathematical factor during the several years involved. It did this largely on the reasoning that it was fair to assume that in the year 1940 when 5.42% was fixed as a proper division, all elements had been properly considered by the directors, and, therefore, the court reasoned, the same percentage should have been applied in earlier years. With equal logic the court might have selected an earlier year where the rate was higher and have taken the percentage applied there as the guiding factor. It will be seen that this method of applying the same mathematical factor through the years entirely disregards a consideration of various elements which the directors said they considered, such as the relative size, earnings and activities of this company, the amount of time it was anticipated an officer would have to devote to corporate affairs of New York Transit for a particular year, what it would cost New York Transit to have separate management, and the general business conditions met by the different companies. It omitted consideration of changes in conditions from year to year. Such changes would normally be expected, especially in a joint enterprise of the present nature, where the relative amount of the total services rendered, or of the facilities shared, varied. In fact the president of New York Transit testified that decided changes had occurred about 1935 or 1936 as to the relative amount of business done by the companies in the Northern Group. About that time a large part of the through transportation of oil which the four companies had handled jointly was re-routed to competing pipe lines through Indiana, Ohio and a part of Pennsylvania. While Buckeye, Indiana, and Northern lost part of this through business, New York Transit continued to transport this oil. These or like conditions adversely affected the other three companies during those periods. Therefore, their share of the expenses was reduced. In 1940 business increased for the other three companies, and the amounts they paid were increased.

It is true that the changes referred to were made with considerable informality in that no directors' meetings were called

to discuss these matters, but it did appear that a majority of the directors consented to each change made. The very informality of proceedings might indicate that no wrongdoing was taking place. The division of joint expenses was required to be fixed in advance. The directors could only estimate business conditions for the year to come. This estimate was based on the experience of the past year, and the anticipation of future business. This estimate did not always turn out to be correct; but the directors apparently endeavored honestly to anticipate business conditions.

That, when business was bad for Buckeye or Indiana, the directors reduced slightly the shares of the joint expenses paid by those companies and increased that of New York Transit accordingly did not necessarily indicate (especially when good faith was found to exist) a gift of New York Transit's funds to the other companies. It indicated, rather, a reduction in the comparative amount of time required to be spent by the officers on behalf of the companies doing the reduced business. At least there was a reasonable basis for such a conclusion by the directors. Good faith having been conceded, there was "candor and equity in the transaction," and the proof establishes "some reasonable proportion between benefits and burdens." (*Globe Woolen Co.* v. *Utica G. & El. Co., supra.*) The degree of interdependence of the various companies in the Northern Group and the changes in the volume of through business may well have required, in the exercise of sound business judgment, an adjustment in the expenses shared. In any event, the directors who determined that such a change was required were in a position entirely different from that of the court which reviewed their actions, in that the directors were required to act prospectively and without the aid of tabulations and statistics compiled long after the fiscal year was over. For a court to interfere and change decisions made by directors by a mere rule of thumb or based on subsequent statistics was, in our view, an unwarranted exercise of judicial supervision over corporate affairs. Actions by directors are left undisturbed when good faith and honest judgment dictate the decisions made. If resort to a court is to be had each time some mathematical basis can be found to support a minority stockholder's claim of error in a decision made by directors as to future corporate requirements, then none but prophets could hope to serve corporations as directors without being subjected to personal liability.

Though the total sum of the modification in allotments ordered by the judgment appealed from herein was not a large

amount, the principle involved is nevertheless important. We are of the view that no misconduct was shown on the part of the defendant directors. The judgment against them should be reversed and the complaint dismissed.

Having arrived at the determination to dismiss the complaint, we must reverse the order granting an allowance to plaintiffs' counsel under section 61-a of the General Corporation Law. The order allowing counsel fees and expenses for defendant directors should be modified by increasing the sum allowed to $10,000, and, as so modified, affirmed.

The judgment dismissing the supplemental complaint should be affirmed, with costs to defendants.

The judgment against defendant directors should be reversed, with costs to said defendants, and the complaint dismissed as to them, with costs.

The order granting allowance to plaintiffs' attorneys, under section 61-a of the General Corporation Law, should be reversed, and the motion for said allowance denied.

The order granting allowance to the attorneys for defendant directors should be modified by increasing the amount allowed to $10,000, and as so modified, affirmed.

MARTIN, P. J., TOWNLEY and COHN, JJ., concur; GLENNON, J., taking no part.

Judgment dismissing the supplemental complaint unanimously affirmed, with costs to the defendants. Judgment against defendant directors unanimously reversed, with costs to said defendants, and the complaint dismissed as to them, with costs. Order granting allowance to plaintiffs' attorneys under section 61-a of the General Corporation Law reversed, and motion for said allowance denied. Order granting allowance to attorneys for defendant directors modified by increasing the amount allowed to $10,000, and as so modified, affirmed. Settle order on notice.