ALFRED TURNER et al., Suing on Behalf of Themselves and All Other Stockholders of American Metal Company, Limited, Similarly Situated, Appellants-Respondents, *v.* AMERICAN METAL COMPANY, LIMITED, et al., Defendants; CLIMAX MOLYB-DENUM COMPANY et al., Defendants-Respondents and Appellants, and HANS BERNSTORFF et al., Defendants-Respondents.

First Department, October 20, 1944.

*Joseph M. Proskauer* of counsel (*Arthur H. Dean, J. Alvin Van Bergh* and *John F. Dooling, Jr.,* with him on the brief; *Sullivan & Cromwell,* attorneys), for defendants-respondents and appellants Harold K. Hochschild, Carl M. Loeb, Otto Sussman, Julius Loeb, Bernard N. Zimmer, E. Norman Hickman, Heath Steele, William H. Brady and John MacLetchie, and for defendants-respondents Siegmund Adler, William Simon, Mary G. Hickman, H. M. Burkey, Carola Blatt and Harold K. Hochschild, and Gertrude Hochschild and Walter Hochschild, as executors of the last will and testament of Berthold Hochschild, deceased.

*John W. Davis* of counsel (*William S. Gordon, Arthur B. Hyman, S. Hazard Gillespie, Jr.* and *William R. Meagher* with him on the brief; *Paskus, Gordon & Hyman,* attorneys), for defendant-respondent and appellant Max Schott.

*George Z. Medalie* of counsel (*George Sylvester* and *Louis Haimoff* with him on the brief) for defendant-respondent and appellant Climax Molybdenum Company.

*David L. Podell* of counsel (*Herman Shulman, Benjamin Algase, Abraham Porter, Sergei S. Zlinkoff, Paul Bauman* and *Wagner, Quillinan, Wagner & Tennant* with him on the brief); *Tachna & Pinkussohn,* attorneys, for plaintiff-appellant and respondent Alfred Turner; *Arnold M. Grant,* attorney for plaintiff-appellant and respondent Marion B. Gutwillig.

*David Cohen* of counsel (*Ambrose G. Todd,* attorney), for defendants-respondents Julian B. Beaty, Hans Bernstorff and Julia A. Bernstorff.

*William S. Gordon* of counsel (*Arthur B. Hyman* and *Morris Katz* with him on the brief; *Paskus, Gordon & Hyman,* attorneys), for defendant-respondent Dennis F. Haley.

COHN, J. This is a stockholders' derivative action instituted on behalf of The American Metal Company, Limited, a New York corporation (hereinafter referred to as "American Metal"). It is a consolidation of two actions brought by stockholders owning 165 out of a total of over 1,200,000 shares of common stock. The earlier action was begun on December 31, 1938, by the holder of 100 shares acquired in that year, and the later by a holder, since 1929, of 65 shares. Plaintiffs acquired their stock many years after the challenged occurrences. No claim was asserted by anyone until over twenty years after the alleged wrongful acts. Parenthetically, it may be observed that recent legislation enacted while this appeal was pending now commands that in an action such as this "it must be made to appear that the plaintiff was a stockholder at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law." (L. 1944, ch. 667, amdg. General Corporation Law, § 61.)

The defendants are Climax Molybdenum Company, a Delaware corporation (hereinafter referred to as "Climax"), and certain individuals, most of whom are or were directors, officers or employees of American Metal.

The complaint charges defendant directors with breach of their fiduciary obligation to American Metal in that (1) they willfully and fraudulently took for themselves 90% of the interest of American Metal in a molybdenum enterprise, which interest was the property of American Metal, and (2) since 1918, in co-operation with defendant Climax, which had been

organized in that year: (a) they wrongfully caused American Metal to put its funds, facilities, resources, personnel, credit and good will at the disposal of Climax for the benefit of themselves and Climax and (b) they wrongfully caused American Metal to refrain from competing with Climax in the sale of molybdenum.

The trial court found in favor of plaintiffs, but held that recovery for misappropriation of the Climax stock obtained by defendants when they took participations in the molybdenum enterprise was barred by the ten-year Statute of Limitations, except as to defendant Max Schott. As to him, the court decided his absence from the State from 1916 to 1931 tolled the running of the Statute. Schott was held liable for the misappropriation of his holdings of Climax and as to such holdings a trust in favor of American Metal was imposed.

The trial court also held that Climax was primarily accountable and the individual defendants, as fiduciaries, secondarily liable (1) for the profits accruing to Climax from American Metal's failure to compete with it in the sale of molybdenum after 1928 and (2) for all benefits received by Climax attributable to the use of the resources, facilities, services and other contributions furnished by American Metal in the development of the Climax enterprise during the period from December 31, 1928, up to the time of the trial of the action. The court also ordered an accounting before a referee.

Though defendants Harold K. Hochschild, Carl M. Loeb, Otto Sussman, Julius Loeb, Bernard N. Zimmer, E. Norman Hickman, Heath Steele, William H. Brady and John MacLetchie because of the bar of the Statute of Limitations were permitted to retain their stock in Climax upon which plaintiffs had asked that a trust in favor of American Metal be impressed, they have appealed from the judgment insofar as it fails to dismiss the action upon the merits. They urge that the decision is an imputation against their honesty and integrity, and has caused great damage to them in the conduct of American Metal. The named defendants also appeal from that portion of the judgment which holds that they are secondarily liable for any judgment which might ultimately be rendered against Climax.

The defendant Max Schott appeals from the interlocutory judgment both upon the facts and the law. He maintains that there should have been a dismissal of the complaint on the merits; that in any event the judgment in favor of American Metal requiring him to account for his stock interest in Climax is barred by the Statute of Limitations.

Climax appeals from the interlocutory judgment insofar as it directs Climax to account to American Metal for the profits attributable to the use of American Metal's resources and facilities from December 31, 1928, to the time of the trial, and to the refraining by American Metal from engaging in the business of steel alloys including molybdenum during said period.

Plaintiffs cross-appeal from the interlocutory judgment insofar as it holds (1) that, as to certain individual defendants, the Statute of Limitations is a bar to plaintiffs' recovery for alleged misappropriation of the Climax stock, and (2) that the Statute limits recovery for profits attributable to the use of American Metal's contributions to the ten-year period prior to 1938. Plaintiffs also appeal from the judgment insofar as it denies any recovery against certain of the individual defendants.

American Metal was organized by Berthold Hochschild in New York in 1887 as a trader in copper, lead and zinc for export and import and for the domestic market. The company was originally the American branch of the German concern, The Metallgesellschaft. Henry R. Merton & Co., Ltd., of England and its wholly owned subsidiary, Merton Metallurgical Company, Ltd., were affiliated companies. American Metal became and is now one of the leading metal companies in the United States. It has been and is international in character. It had started business with a capital of $200,000 and eight stockholders. In 1916, the year when the events which form the basis of this complaint originated, American Metal was still a "closed corporation" with only thirty-three stockholders, all of them related by family ties or business associations. Cross options prevented the shareholders from disposing of their stock without previously offering them to the company or its other stockholders. At that time the stock had not been traded in publicly nor had the company ever had any public financing. The company's stock was not listed on the New York Stock Exchange until the year 1922.

Its capital in 1916 was $3,500,000, and in 1917 it was double that figure. Of the stock outstanding, a large part was in the hands of German and English interests; the remainder was owned by Americans who were officers and employees, with the president and vice-president as the dominant figures. In 1916 the company was managed informally. Small salaries were paid to officers but they were permitted to share in profits through bonuses. This had been the practice of the German and English companies which were the antecedents of American Metal. The profit-sharing was based on a fixed percentage or "tantieme" of the metal company's annual earnings. For those in responsible positions the *tantiemes,* except for modest salaries

paid, took the place of all compensation. By annual action of the stockholders of American Metal based upon specific authority in its certificate of incorporation, about 33% of the profits of American Metal was annually allotted to the "tantieme" fund. Such *tantiemes* were paid through 1919 and were resumed in 1922 and continued through 1928.

It had been the practice of the officers and employees to whom these bonuses were paid to leave the funds on deposit with American Metal for that company's use. There was a second practice of long standing in the German, English and American companies whereby officers, stockholders and employees were permitted to take participations in new business ventures. A risk of loss was thus imposed on participants personally through the investment of their own funds as joint venturers with American Metal in new undertakings of which there were more than forty prior to 1916.

Berthold Hochschild, Carl M. Loeb and, to a lesser extent, Dr. Otto Sussman were known as the management and were regarded as having absolute authority to conduct the affairs of American Metal. The company functioned like a partnership and the management shaped its policies. During the years beginning in 1916 and going through 1924, the *tantieme* deposits of the Hochschilds (that is Berthold and his son Harold), Loeb and Sussman reached the sum of $5,627,002.55 in aggregate and never fell below a net deposit balance of $363,893.20.

At this point it might be well to relate briefly some of the history of molybdenum. Molybdenum is an element, the usefulness of which had been recently discovered. If added to steel in certain proportions, it gave it a better tensile strength and a better lasting quality. Chromium, tungsten and vanadium were known to possess similar qualities. All have the virtue of permitting the cooling of steel at a slower rate to obtain adequate hardness. In 1916 little was known of molybdenum from the commercial standpoint; in fact, its use as a steel alloy was not perfected until the year 1925. The steel industry had to be educated to employ it in proper proportions with other elements to achieve the desired result. The development of molybdenum bore no relationship to the smelting or refining of copper, lead or zinc or of gold and silver, the basic metals in which American Metal traded. To build a market for the metal, it became necessary to establish that a molybdenum alloy steel would be better than any other alloy steel, and cheaper to manufacture.

With the advent of the first World War, molybdenum, despite certain known deficiencies, was employed as a

substitute for tungsten. Yet there was considerable controversy as to the uses and potentialities of the metal. In the spring of 1918 the United States Geological Survey reported that there was "only a restricted market for molybdenum ores". Its sale was limited and unsteady even when war pressure had carried steel production to the greatest volume that had ever been achieved up to that time. In the period between 1916 and 1920 there was a relatively insignificant demand for molybdenum. After the war ended, there were attempts made to interest manufacturers, including the Ford Motor Company. That company made substantial experiments in the use of molybdenum but they failed, and the Ford Company gave up any idea of using the metal at that time.

Neither the defendants nor their engineers knew too much about the use of molybdenum. It was only after years of metallurgical research that it finally became valuable as an alloy for steel. In the beginning it was thought that if a large quantity of molybdenum were added the steel when cooled would have a more even distribution of carbon. Some time elapsed before it was discovered that the less molybdenum used as an alloy in the hardening of steel, the more successful the process. Experiments demonstrated that the use of too much molybdenum resulted in making the finished steel brittle and unsatisfactory for automobile building. Not until 1925 was it certified as such an alloy used in the manufacture of steel for automobiles by the well known and universally recognized Society of Automotive Engineers, an organization composed of leading automobile engineers. It was then that Climax started on its successful career.

In the latter part of the year 1916, a man named Edward G. Heckendorf, who controlled by option certain deposits of molybdenum in a mine on Bartlett Mountain near Climax, in the State of Colorado, approached defendant Max Schott, who was then the manager of the Denver, Colorado, branch of American Metal, in order to persuade Schott to interest American Metal in purchasing the option and developing the mine. On November 20, 1916, Schott, in Denver, on behalf of American Metal, entered into a contract with Heckendorf by which Heckendorf's interest in the molybdenum deposits on Bartlett Mountain was acquired. Heckendorf and his associates were to be given as compensation 25% of the stock of a corporation to be formed. Heckendorf was not the outright owner of the Climax properties. He had merely an option to acquire them from their owner, one Leal. Under the Leal option, the Climax

properties could be acquired for a total purchase price of $125,000. Upon an initial payment of $12,500, deeds to the properties were to be placed in escrow, and if $12,500 additional were paid by the option-holder one year thereafter, that is, November 20, 1917, the holder of the option would become the owner of the properties with fixed liability to pay Leal the balance of the purchase price, to wit, $100,000.

American Metal on its part, in November, 1916, paid to Heckendorf the sum of $12,500 with which he was to make the first payment on the Leal option. American Metal also undertook to provide the funds for the second payment of $12,500, to be paid on November 20, 1917, in the event that the option to buy were exercised. It also agreed to furnish such sums as might be required in connection with the operation of the properties. Repayment of these sums advanced for the development of the mine, with interest at 6%, was to be made prior to distribution of any profits from the operation.

In February, 1918, the new corporation to own and operate the molybdenum enterprise was created and became Climax Molybdenum Company. Twenty-five per cent of the capital stock of the new company was delivered to Heckendorf and his associates. Of the 75% interest left, only 10% was taken in the name of American Metal. The remaining 90% was issued to the individual defendants controlling American Metal. These participants were twenty-four in number. Schott, Hochschild and Loeb were each allotted 10% of the 75% interest, the other participants receiving smaller shares.

One of the principal claims of plaintiffs is that American Metal should have taken the full 75% interest in the Climax enterprise and that in limiting the participation of American Metal to 10% of that interest (which amounted to 7½% of the Climax stock) and accepting for themselves 90%, the individual defendants misappropriated a corporate opportunity or corporate asset for which they should now account. The trial court held that this decision to confine American Metal's interest to 7½% of the Climax venture was not an honest exercise of business judgment but was a breach of fiduciary duty by all the individual participants in Climax. In its opinion, the court expressed it as follows: " On the facts and the law, it must be held that the officers and directors of the Metal Company who participated in the transaction we have been considering, were guilty of a breach of their fiduciary duty to the Metal Company and of having wrongfully diverted from that company to their own benefit and to serve their own interests a corporate oppor-

tunity which belonged to it, in which it had a real ' interest and tangible expectancy '." Defendants-appellants urge that the allocation of syndicate participations made prior to December 31, 1917, and effectuated in February, 1918, was an exercise of sound business judgment by the directors of American Metal.

As previously observed, it had been a uniform practice of those in control of American Metal to have executives, stockholders and employees participate with the corporation in new ventures. There was nothing in the purchase of this molybdenum mine which obligated the directors to treat this new venture upon any basis different from that of other speculative enterprises. Even before the contract with Heckendorf had been signed on November 20, 1916, a participation allotment in the molybdenum venture had been considered, as evidenced by a letter written from Denver on November 16, 1916, to Hans Bernstorff, who was then in charge of the ore department of American Metal. Under this proposed participation, American Metal was to take 51% of the entire venture. After the contract with Heckendorf had been signed and according to entries in the investment book of American Metal early in December, 1916, 70% of the 75% interest in the Heckendorf contract was to be allotted to American Metal and the remaining 30% was to be distributed among twenty-two of the individuals associated with the company. As to this arrangement, the trial court observed that "such a joint participation might well be said to have represented the real business judgment of the directors."

In determining whether it was a valid exercise of business judgment for the directors of American Metal to allot 90% of Metal's interest in the molybdenum enterprise to individual participants and limit American Metal's interest to only 10%, it becomes necessary to consider the situation as it presented itself to the management of American Metal when the challenged allotment was made. Neither American Metal nor the syndicate members were under the slightest obligation to take up the option under the Heckendorf agreement. American Metal had until November 20, 1917, to decide whether it would exercise the option or whether it would abandon the enterprise altogether. Payment of the sum of $12,500 on November 20, 1917, was a necessary step to put into existence the molybdenum property as an asset. It was decided that American Metal should take 10% in the syndicate and that the management should have 90%. Nothing was taken from American Metal. The latter declined to acquire an interest in the molybdenum enterprise equal to that which it might have received under the original plan of allocation.

Between October, 1916, and May, 1917, assays of molybdenite ore from Bartlett Mountain had been conflicting and discouraging. This may have been due to the unfamiliarity of the assayers with molybdenum. At the end of June, 1917, following favorable reports by Pittsburgh Testing Laboratory and The General Engineering Company as to the molybdenum content of samples of the ore, the syndicate was persuaded to go ahead with the construction of a mill on Bartlett Mountain and the installation of the necessary mining equipment, for which purpose the board of American Metal in August, 1917, voted the sum of $300,000.

However, on January 4, 1917, the publication " Iron Age " had printed an article to the effect that molybdenum had proved unsatisfactory from practically every standpoint. Dr. George W. Sargent, vice-president and chief metallurgist of Crucible Steel Company and one of the foremost authorities on the subject, in February, 1917, had stated to B. N. Zimmer, one of the defendants, that he regarded the molybdenum market as uncertain and unsteady; that he had not much confidence in the future of molybdenum for the manufacture of special steels and that he had looked into the Heckendorf property and rejected it. Molybdenum in 1917 was selling for approximately $1.75 per pound. It was estimated that its normal peacetime price would be only 75 cents per pound. At this price it was found that mining molybdenum would offer no attraction as return for the tremendous investment required.

Moreover, the whole picture had changed in the fall of 1917. According to the testimony of defendant Carl M. Loeb, metal prices had been declining through the year 1917. Costs had risen and the opportunity to sell for export had disappeared. The mill at Climax did not start operating until February, 1918. Nonetheless Loeb did not favor an abandonment of the enterprise because it might be a reflection upon the business acumen of American Metal. Berthold Hochschild, who controlled the largest American holding of the company, who was its chief executive and whose decision was virtually final on questions of policy, looked upon the venture as a " war baby " and wished to discard it entirely. A factor which induced American Metal in August, 1917, to build the mill at Climax and to open up the mine, had been the anticipated Russian demand for molybdenum. With the advent of the Russian Revolution early in November, 1917, that market collapsed. When it became obvious that the cost of the molybdenum project would be far in excess of the original estimates, that the anticipated Russian market

was lost, that, at best, the molybdenum venture was speculative, the heads of American Metal had about decided that the Leal option should not be taken up and that the enterprise should be altogether abandoned. It was then that Berthold Hochschild's ultimatum came that, if the officers wished to go forward with the venture, they should assume 90% of the risk, with American Metal taking the balance. Accordingly, the directors and officers of American Metal agreed that the option should be exercised, and that American Metal's interest should be 10% of the syndicate, i. e., 7½% of the total venture. The effect of this allocation was to require the individual participants on December 31, 1917, to pay to American Metal $329,189.32 to cover their share of expenses through the end of 1917. This sum represented advances made by American Metal in their behalf, plus 5% interest. The directors and stockholders of American Metal who had formed the syndicate to develop the molybdenum venture had their accounts with American Metal debited with their proportionate share.

Those experienced in mining enterprises who regarded the molybdenum venture as risky and speculative were apparently justified in their conclusion, for the ore which had been counted on at the time of the purchase of Climax, was exhausted in 1926. Only through the discovery of new ore on properties not acquired until 1925 was the enterprise saved from closing in 1926 with a net loss of well over a million dollars. Accordingly, Climax could not, as plaintiffs assert, be regarded in the year 1917 as an enterprise of assured success.

The fairness of the transaction must be measured not by hindsight but in the light of the circumstances which presented themselves at the time of the transaction. The good faith of the decision made by defendant directors in 1917 must be tested, not by the ultimate financial success of Climax achieved after 1928 but by the facts as they existed when the decision was made. In *Blaustein* v. *Pan American Petroleum & Transport Co.* (293 N. Y. 281, 304) the Court of Appeals, in an opinion by LEWIS, J., said: "The law requires of directors that they shall exercise in good faith that care which the problems confronting the corporation demand. To determine whether transactions approved by directors subject them to liability for a breach of duty we look to the facts which relate themselves to the problems involved as they exist at the time of their occurrence, not aided by those which occur subsequently. 'A wisdom developed after an event and having it and its consequences as a source is a standard no man should be judged by.' (*Costello* v. *Costello*, 209 N. Y. 252, 262.)"

The Climax venture, we think, was honestly considered a speculation and a risk by the directors of American Metal, and the limitation by them of American Metal's participation to 7½%, in the light of circumstances as they existed in the latter part of 1917, was not a breach of fiduciary duty but a valid exercise of sound business judgment.

The undertaking in molybdenum was not so related to the business of American Metal as to be a true corporate opportunity. Its business was dealing in copper, lead, zinc, gold or silver, and the smelting, refining and marketing of these basic metals. A ferro alloy, such as molybdenum, was alien to the principal business of American Metal. The molybdenum enterprise did not call for trading in the usual manner in the metal markets. It involved the opening of a new mine, a long period of time to educate the consumers as to the result of metallurgical research, and the creation of a market for the metal. There was not involved the expansion of any existing department of American Metal; there was founded a new industry.

In cases where the corporate opportunity theory has been applied, the object of the opportunity had the inherent aptitude of being integrated into the existing business of the company. Here there was a completely new departure and American Metal did not have the fundamental knowledge or practical experience to exploit the venture. The pertinent principle is expressed in *Guth* v. *Loft, Inc.* (23 Del. Ch. 255):

" The real issue is whether the opportunity * * * was so closely associated with the existing business activities of Loft, and so essential thereto, as to bring the transaction within that class of cases where the acquisition of the property would throw the corporate officer purchasing it into competition with his company. This is a factual question to be decided by reasonable inferences from objective facts. [p. 277]

" * * * Where a corporation is engaged in a certain business, and an opportunity is presented to it embracing an activity as to which it has fundamental knowledge, practical experience and ability to pursue, which, logically and naturally, is adaptable to its business having regard for its financial position, and is one that is consonant with its reasonable needs and aspirations for expansion, it may be properly said that the opportunity is in the line of the corporation's business." (p. 279.)

The mere fact that American Metal was primarily engaged in trading in the basic metals and may also have dealt in trifling

quantities of molybdenum during the war did not compel the corporation to enter a new industry. Plaintiffs are now attempting to apply the corporate opportunity theory because after a lapse of many years molybdenum has turned out to be a profitable speculation.

It may not be said that there was imposed upon American Metal a mandate to extend its activities into the field of molybdenum. The record shows that officers, directors and stockholders in full possession of all material facts, consistently over the years, declined to acquire a larger interest in Climax and to extend American Metal's business into a field of ferro alloys. No mandate can be implied where substantial stockholders have expressed their desire not to extend activities in the direction of the so-called corporate opportunity. "There is no power to compel the majority to take action it does not desire to take." (*Ripin* v. *U. S. Woven Label Co.*, 205 N. Y. 442, 446.) "There is certainly no presumption that a minority stockholder is right, and a majority stockholder is wrong, in opinion as to the values and the management of the corporate property." (6 Thompson on Corporations [3d ed.], § 4493.)

Furthermore, the speculative nature of the enterprise precludes the inference of a mandate. The naked opportunity of putting money in what was termed a "mining wildcat" in 1917 could hardly be denominated a corporate asset. In cases of speculative ventures courts have generally declined to impose a constructive trust. (*Twin-Lick Oil Co.* v. *Marbury,* 91 U. S. 587, 592-593; *Patterson* v. *Hewitt*, 195 U. S. 309, 320; *Sunny Brook Zinc & Lead Co.* v. *Metzler*, 231 F. 304, 311.) What was said in *Norway* v. *Rowe* (19 Ves. Jr. 144, 159) by Lord Eldon is in point: "Consider the nature of such a concern. It frequently remains for years in the most hopeless state; and may at last be rendered profitable by an adventurous speculator, embarking property of his own and others in the pursuit. The speculation is very hazardous; perhaps when you have a golden prospect, the whole may fail. I have known a copper-mine producing £20,000 a-year; and the next week worth nothing; and that is as true of coal-mines. There are persons, who will stand by; see the expenditure incurred; if it turns out profitable, set up their claim; if otherwise have nothing to do with it." There is no tangible expectancy in a gamble. We find that the molybdenum venture was not so related to the business of American Metal as to be a corporate opportunity.

The trial court indicated that an improper motive influencing defendants in effecting the change in November or December, 1917, from an American Metal enterprise in which the company had a large share, to a syndicate enterprise in which the corporation only retained a small one, was a fear on the part of defendants in effecting the change in November or December, the United States Government would take over the stock holdings of the German interests; that the defendants desired, in that event, at least, to have control of the Climax enterprise.

Foreigners had a large interest in American Metal. Of the 35,000 shares outstanding in December, 1916, 10,405 shares were owned by the eighteen officers and employees who lived in America; 8,368 shares were owned by affiliated English interests; and 16,227 shares were German owned. The Trading with the Enemy Act (40 U. S. Stat. 411, ch. 106; see U. S. Code, tit. 50, Appendix, § 1 *et seq.*) had been enacted by the Congress of the United States in October, 1917. It took effect as of April 6, 1917. By its provisions, the Alien Property Custodian, after October, 1917, could seize all alien property as of April 6, 1917. In its opinion, the trial court observed " That is why, although they made the change, in November or December, 1917, the document evidencing it was predated to April 2, 1917, four days before this country entered the war."

The court found that a participation list bearing date April 2, 1917, was predated to deceive the Alien Property Custodian. This list is a typewritten carbon copy of participants. It is unsigned and contains the name of each participant together with the actual percentage of the molybdenum venture finally allotted to each by the management. There were produced nine similar informal typewritten lists, all with different percentages, but each bearing the date " April 2, 1917." These papers were obviously antedated. If Hochschild was responsible for the antedating, we cannot guess as to why it was done. Hochschild died many years before the trial and we have not the benefit of his testimony. However, there is not the slightest evidence that these papers were signed, or that they were relied upon by the Alien Property Custodian. So far as the proof goes, they were never exhibited to anyone nor do we find any evidence that they were intended to deceive anyone. They were not instruments of transfer nor were they excerpts from the books of American Metal. As defendants correctly urge, no one twenty-five years after 1917 can be sure as to the reason why the date " April 2, 1917 " was typed on these lists. No one has any recollection of their significance, yet they are emphasized as having been created

falsely to indicate that the participations had been decided upon by the defendants before entry of the United States into the first World War. Such an inference is founded merely upon surmise and suspicion.

In the permanent and bound records of American Metal, the original allotments in the Climax syndicate of late 1916 and early 1917 had been recorded on page 274 of Investment Book V. On the opposite page, there is entered and appears the reallocation of the company's participation from 70% to 10% together with the figures indicating each individual's increased participation. The entries on page 275 are dated December 31, 1917. Nowhere in the records of American Metal does the date April 2, 1917, appear. Moreover, the general ledger of American Metal discloses that the reallocations were made on or before December 31, 1917. On that date expenses of $365,765.93 were charged, 90% to the individual participants, mentioning each one by name and indicating the specific sum charged against each name, and 10% was charged to American Metal. Likewise the minutes of the board of directors of American Metal show affirmatively that no reallocation had been made as late as September 10, 1917. If the purpose of the " April 2, 1917 " date on the sheets was to enable the management to mislead the Alien Property Custodian into believing that the final allotment had been made on that date, certainly a necessary part of the plan would have been to make corresponding changes in the permanent books of the company, to wit, the investment book, the minute book and the general ledger. The court itself stated " There is no evidence that such misrepresentation was ever relied upon by any party in interest."

In January, 1918, the Alien Property Custodian seized the German shares representing about 49% of the outstanding stock of the Metal Company. The power of the Alien Property Custodian to seize American Metal or any of its stock was limited to the 49% German interest. (40 U. S. Stat. 411, 415, 416; *Hamburg-American Co. v. U. S.*, 277 U. S. 138; *In re Sutherland*, 23 F. 2d 595, 598.) So long as the American management was willing to co-operate with the United States Government in eradicating the German interests from American Metal and its Mexican subsidiaries, the American management stood in no danger of losing control. The Alien Property Custodian himself reported that the officers of American Metal courted an investigation of the affairs of the company, heartily co-operated with him in eliminating the German interests and satisfied him completely as to their good faith. Indeed, the Custodian at no time indicated

that he would take American Metal away from the American management or that he would seize it. In view of all this, there is no basis for the conclusion that the reallocation was made because the directors feared that they might lose control of American Metal and of its management and at the same time lose control of Climax.

Pursuant to a suggestion to that effect made by the Alien Property Custodian, in the year 1920 the participants made an offer to transfer to American Metal all their holdings in companies in which American Metal also had an interest. This offer included all the holdings of the participants in Climax. Since the offer was at cost, American Metal could make the very investment which the individuals had made in Climax in 1917 and acquire the entire equity interest in the venture. It was thus placed in the advantageous position of being able to consider the question of investment with the benefit of more than two years hindsight. Our examination of the records satisfies us that the offer was bona fide and made under circumstances which demonstrated the ability of the participants to make good the offer.

A discussion of events leading up to the offer becomes necessary. The Alien Property Custodian had assumed control of the German interest in American Metal in 1918 and in December of that year a voting trust agreement was entered into. Henry Morgenthau and Joseph F. Guffey were appointed voting trustees on behalf of the Custodian, and Berthold Hochschild became the voting trustee representing the remaining interests. On November 26, 1919, 34,644 shares of 70,000 outstanding (the original number of shares had been doubled in 1917) were sold at public auction by the Alien Property Custodian to a syndicate. This syndicate was made up of representatives of L. Vogelstein & Co., Inc., which had been a competitor of American Metal, Cerro de Pasco Copper Corporation, and C. D. Barney & Co. It purchased 35% of the stock interest in American Metal, Vogelstein buying 14,000 shares and the Cerro de Pasco group 10,644 shares, the balance of the German stock being taken by the Hochschild group. Ludwig Vogelstein then became the active man in the company, the largest individual stockholder, and the actual head of American Metal. He was made its first vice-president and a director and later became chairman of the board of directors. Edward H. Clark, vice-president of Cerro de Pasco Copper Corporation, was also elected to the board on February 13, 1920, as was John P. Grier, a partner of C. D. Barney & Co. Clark and Vogelstein had wide experience in the mining field and were leading figures in

the metal world. Neither Clark nor Vogelstein has ever owned any shares of stock in Climax. They were not interested in the molybdenum business and their loyalty was wholly with American Metal.

After this new blood had been infused into American Metal, a meeting of the stockholders was held in February, 1920. Shortly thereafter, a meeting of the board of directors was had, and, according to the testimony of defendants, the holdings of the individual participants in the five companies, including Climax, in which American Metal also had an interest, were offered to American Metal in line with the intimation of the Alien Property Custodian. At the board meeting of February 13, 1920, when this offer was presented, Clark and Vogelstein, who had not the slightest interest in Climax but owned or represented very large interests in American Metal, were appointed by the board to serve on a committee to investigate and determine whether the offer should be accepted.

Minutes of a meeting of the executive committee held on March 9, 1920, record: " Mr. Clark stated that after full investigation and discussion with the associates and with Mr. L. Vogelstein, including all of the new stockholders who had recently acquired substantial interests in the Company, they had come to the conclusion that it was inadvisable for the Metal Company to acquire these individual holdings. They were willing, therefore, that a record should be made on the minutes of the Company to the effect that they were fully acquainted with the facts and fully cognizant of the individual ownership of the officers and directors of the corporation in the above-mentioned companies, and were entirely willing to have these individual holdings remain as at present for the time being."

Upon the trial, Clark testified that he, with Vogelstein (who died several years before this action was commenced), had investigated very fully and carefully into the financial circumstances of the companies, including Climax,— their location, other prospects, and their history. As to Climax, they felt that the molybdenum venture was very uncertain and they could see no justification for making any further investment in it. Clark related that Vogelstein had told him that Carl M. Loeb would be willing to take 75 cents on the dollar for his interest, and that some of the Climax stock might even be bought for 50 cents on the dollar. Of added significance is the fact that all members of the Cerro de Pasco syndicate acquiesced in Clark's and Vogelstein's conclusion not to take over the investments of the participants in Climax and the other four companies.

It has been suggested that the offer made by the original syndicate to sell to American Metal all stock belonging to the participants at cost was merely a pro forma offer. The evidence in the case does not support such an inference. The interest of Vogelstein as the largest stockholder in American Metal, and his duty as a fiduciary of American Metal and for the voting trust certificate holders, refute the idea that he was not faithfully serving the welfare of American Metal or that he was permitting the mere making of a formal entry of the offer in the minutes. If Climax were then thought to be valuable, the self-interest of Clark, Vogelstein and the Hochschilds would have dictated a prompt transfer of the original syndicate's interest in Climax to American Metal. The Hochschilds would be in a better position if it had been decided to take over the syndicate's participations in Climax. They had a larger proportionate interest in American Metal than in Climax. The total of their participation in Climax through their corporate participation and through indirect holdings in American Metal, was over 11%. If American Metal were to take over Climax in toto, their holdings in the latter, through American Metal, would have been increased to over 13%.

Plaintiffs attempt to escape the effect of this offer to sell all acquired Climax stock at cost to American Metal and its rejection by charging that defendants had not fully disclosed the circumstances of what plaintiffs call " the misappropriation of the corporate opportunity or corporate asset ", whereby the participation of American Metal in Climax during November, 1917, was limited to 10%, instead of the 75% to which it was entitled under the Heckendorf contract.

A sufficient answer to that contention is to be found in the fact that the new group, holding 35% stock interest in American Metal, had no desire to increase its participation in Climax, because at that time scarcely anyone in American Metal considered molybdenum of any value. Vogelstein felt that the business of American Metal was best suited for copper, lead and zinc. Moreover, he had no confidence in molybdenum. He is quoted as saying: " *. * * You call it molybdenum today, and tomorrow you call it colybdenum." He told Phillipson, who was then vice-president of Climax and who had the greatest faith in molybdenum, that he (Phillipson) was following a forlorn hope, and Vogelstein advised him to stop chasing rainbows. When it was suggested that American Metal be permitted to take over the Climax stock, he said to Dr. Sussman: " It is your baby. That is where it is going to stay, and I feel sorry for you."

The 1920 offer was at cost. American Metal could then have

acquired the identical investment which the individuals had made in Climax in November, 1917, with the unusual advantage of being able to consider the advisability of the investment in the light of the experience of the two and one-half preceding years. When the management decided in 1917 to go ahead with the investment in Climax, the mill was not yet in operation, the duration of the war with the consequent demand for molybdenum was unknown, and the possibility of a peace-time market was a matter of speculation. By the year 1920, these elements had all been defined. The expense of the project during the two years was known; the capacity of the mill, and the extent of the recovery of molybdenum had been established; and knowledge of the peace-time demand was available. With these facts before them, the directors of American Metal were called upon to exercise their judgment as to whether American Metal should increase its investment in Climax. If they were to decide to take over the stockholdings of the participants in the syndicate, this would have meant an immediate additional investment by American Metal of approximately $855,000.

Even upon the assumption that the individuals had wrongfully taken their Climax participations, in the circumstances here, they would have to be compensated to the extent of what they had paid. (Restatement of the Law of Restitution, § 194, comment b; *Casari et., Aplnts. v. V. A. Ent., Inc., Aplnts.*, 327 Pa. 382, 389; *Griffith v. Boom and Lumber Co.*, 46 W. Va. 56; *Cann v. Barry*, 293 Mass. 313; *Chain O'Mines v. United Gilpin Corporation*, 109 F. 2d 617, 621, certiorari denied 311 U. S. 659.)

Up to 1920, American Metal had invested but $90,000; its 10% share of the cost of Climax. Whether American Metal should invest an additional $855,000 was a matter of business policy for the board of directors to decide. Its decision not to purchase the Climax stock from the participants we are persuaded was made in good faith and in the exercise of honest judgment. Under settled law, such a corporate act within the corporate powers is valid and binding upon the corporation and its stockholders. The internal affairs, questions of policy of management, and expediency of contracts of a corporation are subject to the control of a board of directors, and insofar as those directors are honest, capable and independent, their judgment is final. (*Blaustein v. Pan American Petroleum & Transport Co.*, 293 N. Y. 281, 303–304; *Pollitz v. Wabash R. R. Co.*, 207 N. Y. 113, 124; *Everett v. Phillips*, 288 N. Y. 227, 236, 237; *Kehaya v. Axton*, 32 F. Supp. 266, 270.) The power of a board of directors is well stated in *Pollitz v. Wabash R. R. Co.* (*supra*, p. 124): " They

were the exclusive executive representatives of the corporation and were charged with the administration of its internal affairs and the management and use of its assets. Their corporate acts, within the powers of the corporation, in the lawful and legitimate furtherance of its purposes, in good faith and the exercise of an honest judgment, are valid and conclude the corporation and the stockholders. Questions of policy of management, expediency of contracts or action, adequacy of consideration, lawful appropriation of corporate funds to advance corporate interests, are left solely to their honest and unselfish decision * * * ." In *Corbus* v. *Gold Mining Co.* (187 U. S. 455, 463), the United States Supreme Court enunciates the rule as follows: " The directors may sometimes properly waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right. They may regard the expense of enforcing the right or the furtherance of the general business of the corporation in determining whether to waive or insist upon the right. And a court of equity may not be called upon at the appeal of any single stockholder to compel the directors or the corporation to enforce every right which it may possess, irrespective of other considerations. It is not a trifling thing for a stockholder to attempt to coerce the directors of a corporation to an act which their judgment does not approve, or to substitute his judgment for theirs.''

The trial court nevertheless disregarded the action of the board of directors taken in 1920 upon the theory that their determination was not binding on the corporation and could not be binding unless the stockholders approved. The participation in the Climax enterprise by defendants was, the court held, a willful breach of trust on the part of defendant directors, and there could be no ratification or acquiescence by the stockholders or estoppel as to them unless all the facts in connection with " the original wrongdonig had been disclosed to the stockholders ''.

We find that there was no occasion for the submission of the proposition to stockholders. Quite apart from our ruling that the original participation of defendants in Climax was not in the circumstances a breach of trust, the 1920 offer to turn over to American Metal the participation of the individuals in Climax was not an attempt to absolve anyone from wrongdoing. It was a proposal to carry out the idea, originating with the Alien Property Custodian, that American Metal should acquire the individual holdings of directors and stockholders. Even if defendants were constructive trustees of their Climax interests and American Metal thus had the right to acquire the interests

of defendants in Climax, it was within the discretion of the board of American Metal to decide whether the expense necessary to do so, should be incurred. The determination of such a question of business policy lay with the board of directors. The power to determine exists even where the directors, who, in some instances, were also directors in Climax, might have a personal interest in the determination. The law is settled that while the dual position of directors makes the fair exercise of judgment by them more difficult and requires a court to scrutinize these transactions with care, it does not " alone suffice to render the transactions void." (*Everett* v. *Phillips,* 288 N. Y. 227, 237; *Chelrob, Inc.,* v. *Barrett,* 265 App. Div. 455, 457; *Marony* v. *Applegate,* 266 App. Div. 412, 422.) As we find that the board acted honestly and in entire good faith, there may be no interference with their judgment.

If there had been any litigation in 1920, or even at any time up to 1925, involving the question of the wisdom of the board of directors in refusing to take over the interests of the individuals in Climax upon an additional investment of .$855,000, no court would have found the exercise of their judgment unwise. The mine had then been closed since the spring of 1919. It did not reopen until September, 1924. Climax had shown a net loss of $110,383.82 for 1919, and in 1920 there was a net loss of $220,882.61. In the latter year the company was able to sell only twelve tons of its product. The market for molybdenum was virtually nonexistent. In the circumstances as they presented themselves in 1920, the decision of Vogelstein and Clark, who were wholly disinterested in Climax, approved by the board and a majority of the stockholders, not to make the investment necessary to take over the individual defendants' interest in Climax, was obviously an exercise of sound business judgment.

The action of the directors of American Metal since 1920, in refusing to increase the corporation's proportionate 1917 interest in Climax, further evidences the fact that, in the exercise of reasonable business discretion, they determined not to do any further speculating in the molybdenum enterprise.

On March 16, 1920, Climax offered to issue ratably to its stockholders an additional share of stock for each $10 loaned to Climax, and, in the event of any stockholder failing to take his prorata share, Climax had the right to obtain the balance of the fund from other stockholders. Climax had hoped to raise $500,000 for development work, but only $281,000 of the anticipated $500,000 was subscribed. American Metal accepted its share of $37,500, upon condition that a substantial

majority of the other stockholders would take up their quotas. It did not avail itself of the residuary right to increase its own subscription, although it could have taken up the balance of $218,310 which had not been subscribed. If American Metal had then acquired this balance, it would have received 21,831 shares, in addition to the 7,500 which it already had, making a total of over 29,000 shares, or about 29% of the Climax stock outstanding. Yet, Vogelstein and his associates refused to permit American Metal to subscribe for more than its share of the loan and of the stock. Again in 1923 American Metal declined to take more than its prorata share of additional Climax financing. In a further attempt to reduce the growing Climax debit balance, Climax sent out on November 20, 1923, a letter to its stockholders asking them to purchase additional preferred stock, but American Metal would take no more than its proportionate share. Thus, it is apparent that at least up to the end of 1923, the directors refused to make investments in Climax other than what were absolutely essential, for the patent reason that Climax was, during all these years, a losing speculation.

The manner in which Climax was financed demonstrates the burden each of the defendants was called upon to assume to keep the venture a going concern in its trying years. Up to December 31, 1917, American Metal had advanced $365,765.93, but this was assessed and apportioned against the syndicate members as of that date. An additional $82,709.67 was supplied up to February 13, 1918, at which time the first meeting of directors of Climax was held. Climax assumed the obligations totalling $448,131.43 which had been advanced by American Metal. Climax issued notes to the various syndicate members representing the amounts respectively of their advances. At the same time, 37,500 shares of stock, which represented 75% of the total issue of Climax, were issued to the participants in the syndicate, including American Metal, in proportion to their respective interests in the syndicate. The remaining 12,500 shares went to Heckendorf and his associates. American Metal received as its prorata share 3,750 shares of stock, and $45,112.50 in face amount of 5% notes, representing $44,365.86 in advances, and interest thereon. The clearing of the advances through February 13, 1918, was recorded in the books of American Metal on July 12, 1918. By that time a total of $823,131 had been advanced, of which only 10%, or $82,313, was assumed by American Metal. Advances were all paid in full, with interest, by the respective participants.

When in 1923 Climax sought to raise additional funds through the issuance of preferred stock, Phillipson, then president of Climax, wrote the stockholders that, unless $500,000 in subscriptions was received, all might be lost through enforcement of payment of outside indebtedness. The Heckendorf interests, with which Schott was at that time identified, protested, claiming that it was an attempt to freeze out the Heckendorf group, and that, under the Heckendorf contract, American Metal was required to finance Climax. This ultimately led to what is referred to as '' the Weber litigation '' (*Weber* v. *Climax Molybdenum Co.,* 127 Misc. 470), in which the Supreme Court, Westchester County, held that American Metal was obligated, under the Heckendorf contract, to finance Climax until it should finally be made to appear that the properties could not be operated successfully, and that all advances made were made pursuant to the contract obligation. The defendants had always been of the firm belief that the obligation of the syndicate to finance the new enterprise was to be at an end when Climax was incorporated, provided by that time a mill had been built, operating equipment furnished and operations commenced. For a time the Heckendorf interests acquiesced in this view. The Weber judgment directed the cancellation of all stock of Climax except the issue of the original 50,000 shares. That judgment was affirmed in the Appellate Division, Second Department (217 App. Div. 756), and an appeal by permission (217 App. Div. 771) was taken to the Court of Appeals. This was subsequently withdrawn. In the meantime, the efforts of Phillipson and those who had faith in molybdenum were bearing fruit. The mine which had been shut down in the year 1919 was finally reopened in September, 1924.

In September, 1926, the Weber litigation was compromised. The settlement provided for the abrogation of the Heckendorf contract, the cancellation of all outstanding preferred stock, redistribution of the common stock, and the issuance of debenture notes for all moneys theretofore advanced to Climax. The status of the Weber litigation was explained to the directors of American Metal in September, 1926. In October of that year, the directors approved the settlement. Pursuant thereto American Metal and the individuals associated with it who participated in the Climax venture, received debentures for the moneys advanced. American Metal received debentures aggregating $387,440.66, representing principal and interest on such advances. These debentures were eventually paid by Climax.

The Weber law suit afforded a second opportunity to the board of directors of American Metal to investigate the circumstances concerning the Climax venture. During the period of the Weber litigation, the board of directors of American Metal had members who owned no stock in Climax. Indeed, Vogelstein, keen sighted as he was, if he had any faith in molybdenum, would have been the type of man to have seized and capitalized the business opportunity, if he had found one to exist.

The financing of Climax, from American Metal's point of view, was distinctly profitable. In 1920, after Vogelstein became the leading figure in American Metal, the Hochschilds, Carl M. Loeb, Julius Loeb, Dr. Sussman and a Mr. Schloss personally guaranteed payment of advances made on behalf of the individual participants, and in April, 1924, all advances were paid by the guaranteeing directors. This was months before the Climax mines were reopened in September, 1924. Detailed schedules setting forth the deposit balances with American Metal of the Hochschilds, the Loebs and Sussman, showed plainly that for practical purposes American Metal was secured in cash throughout by the deposit balances the management and Climax maintained with it. In the lean years, that is from November, 1916, and through 1924, defendants' credits with American Metal far exceeded the Climax debits. Only in July, 1922, did defendants' credits temporarily fall below the Climax debits; but that was at a time when defendants had purchased a large share of preferred stock issued by American Metal. The responsibility of the individual participants for their proportionate share of advances to Climax was never questioned. They were always charged with their prorata share with interest, and in many instances, interest compounded. The advances, together with the interest charges, were all paid before Climax had become a successful enterprise.

The trial court made frequent reference in its findings to the failure of defendants to make their guaranty of payment of advances by American Metal to Climax in written form. However, there is no doubt that the promise was made and enforced. The actual performance of the guaranty in 1924 speaks louder than any technical claim that it was not in writing and proves the good faith of defendants. It precludes any suggestion that the guaranty lacked either existence or validity. It may have been unbusiness-like not to have the guaranty in writing, but the nature of American Metal as a small " closed company ", and defendants' substantial deposits, made it clear that they would do what they ultimately did — live up to the very letter of their

agreement. American Metal was in every sense the gainer on the complicated debits and credits involved, for it always received with substantial interest a return of its advances on behalf of the individual participants in Climax.

For all of the foregoing reasons, we conclude that plaintiffs' claim against the individual defendants, which charges a breach of fiduciary duty on their part because of defendants' participation in the Climax syndicate, is without merit, and that the complaint should be dismissed against all individual defendants upon that ground.

The judgment appealed from places defendant Schott in a position somewhat different from that of the other individual defendants. He alone has been held to account for the Climax stock allotted to him. He was elected a director of American Metal on November 22, 1916, and resigned on January 12, 1918. Thus when he entered into the negotiations with Heckendorf on behalf of American Metal, Schott was not an officer or director of American Metal. He carried out every obligation he was called upon to perform in his capacity as employee or agent for American Metal. He had no power to make the decision that American Metal should accept the Heckendorf proposal; that determination he left to his employer, American Metal. Schott's enthusiasm and insistence that American Metal take on the Climax venture resulted in requiring him to agree to make a 10½% investment in Climax. He was only alloted a 7½% interest, with the understanding that his subscription was subject to the control of American Metal's officers. Schott was not an American Metal director when the Climax properties were delivered to the new corporation nor when the stock representing his share in Climax was delivered to him. For his entire interest in the new company he paid full value, as he had on deposit with American Metal funds far in excess of his share of the advances with interest. There was no breach of duty by Schott in entering into this transaction with American Metal and its directors. Schott's interest in Climax was the result of his contract with American Metal prior to the time that any alleged corporate opportunity arose which the directors of American Metal are claimed to have exploited. In accepting his allotment of 7½% in the molybdenum enterprise, he was fulfilling his prior commitment. We find no basis for the determination that Schott's investment in Climax was made in bad faith, for the purpose of insuring control of Climax in the event that the United States Government took over the stock holdings of the German interests in the Metal Company. The complaint as to Schott should have been dismissed on the merits.

It was held by the trial court that the ten-year Statute of Limitations was applicable to the claim against the individual defendants save as to Schott and that the lapse of two decades between the alleged wrong and the commencement of suit bars recovery against them. As to Schott, the court decided that, although he resided in New York State for seven and one-half years before the suit was commenced, his prior continuous absence, within the meaning of section 19 of the Civil Practice Act, tolled the running of the ten-year Statute of Limitations and that the six-year Statute of Limitations does not apply.

The court, we think, correctly decided that the ten-year Statute of Limitations is applicable in an action such as this to impress a constructive trust upon specific property. (*McLear v. McLear*, 291 N. Y. 809.) Nevertheless, we find that the claim against Schott is barred. (Civ. Prac. Act, § 53.) Section 19 of the Civil Practice Act, as it read before the recent amendment of 1943, provided as follows: " *Effect of defendant's absence from state or residence under false name.* If, when the cause of action accrues against a person, he is without the state, the action may be commenced, within the time limited therefor, after his return into the state. If, after a cause of action has accrued against a person, he departs from the state and remains continuously absent therefrom for the space of one year or more, \* \* \* the time of his absence \* \* \* is not a part of the time limited for the commencement of the action. \* \* \* " (L. 1928, ch. 809, in effect Sept. 1, 1928.)

Any cause of action against Schott accrued not later than April, 1918, when Climax issued and delivered to him 3,750 shares of stock. The trial court specifically found, and with these findings we agree, that save for the fourteen-month period between June 14, 1930, and August 20, 1931, when Schott was in Europe, he was physically present in New York State in each of the twelve years from 1918 to 1931, for a total of thirty-seven different times; that in each instance he remained in the State of New York for periods ranging from a few days to fifteen weeks at a time, and that for seven years and five months, namely, from August 20, 1931, to January 26, 1939, when he voluntarily appeared in this action, he was regularly present in the State of New York. There is not a particle of evidence that Schott ever attempted to secrete himself while in New York or that he sought to avoid service of process. In the leading case of *Fowler v. Hunt* (10 Johns. 464) the court said: " The coming from abroad must not be clandestine, and with an intent to defraud the creditor by setting the statute in operation and

then departing. It must be so public, and under such circumstances, as to give the creditor an opportunity by the use of ordinary diligence and due means, of arresting the debtor.''

Upon his numerous appearances here, Schott was always available for service of process by American Metal. Between the years 1918 and 1923, Schott came to New York on the affairs of American Metal and had numerous business conferences with officers and directors at its offices in New York City. In 1924, 1925 and 1926, he was often in New York to engage counsel to commence the Weber litigation, and later he was in frequent conference with Hochschild in an effort to settle the dispute. In effecting the settlement of the Weber litigation, he was constantly associating with officers of the American Metal Company over the issue of Climax financing. As a result of the adjustment of the Weber law suit, Schott was elected a director of Climax in 1926. Between that time and 1930, he attended meetings of Climax held in the offices of American Metal. These meetings were attended by officers and directors of American Metal. The independent directors of American Metal knew or were charged with knowledge of any cause of action which American Metal may have had against Schott. They could have served him at any time he was here.

When a nonresident comes into the State for the first time after a cause of action has accrued, he is regarded as making a return to the State. (*National Surety Co.* v. *Ruffin*, 242 N. Y. 413, 418.) Under the statute, presence within the State, not residence, is made the test of whether the period of statutory limitation runs against a debtor. (*Mack* v. *Mendels*, 249 N. Y. 356, 363.) Availability to personal service of process is the underlying purpose of section 19. During each of the many occasions when Schott was in New York, throughout the years from 1918 to 1930, he was readily available for service of process by American Metal. There is no case in this State which holds that the statute is tolled when the prospective defendant is in the jurisdiction to the personal knowledge of the prospective plaintiff and in his presence so as to be amenable to service of process in the exercise of ordinary diligence. The rule is set forth in 37 C. J., Limitations of Actions, 1009, as follows: '' In order that a return into the jurisdiction after an absence which has interfered with the running of the statute of limitations may set the statute in motion, defendant cannot come secretly or privately into the jurisdiction for the mere purpose of starting the statute to run. But he must be able to show that plaintiff either knew of the return so as to have had an opportunity to avail him-

self of the presence by bringing suit, or that the return or stay was so public or of such length as to amount to constructive notice or knowledge or to raise the presumption that if plaintiff had used ordinary diligence he might have brought his action * * * ''

Clearly Schott's initial entry, and his subsequent re-entries into this State up to June 14, 1930, and after August 20, 1931, with the actual knowledge and in the presence of officers of American Metal, constituted " presence " sufficient to be a return within the purview of section 19 of the Civil Practice Act, for the purpose of starting and continuing the operation of the Statute of Limitations. Upon the facts, the ten-year Statute of Limitations outlaws any claim which American Metal might have had against Schott in connection with his acquisition of the Climax stock. As plaintiffs in this derivative stockholders' action are in no better position than American Metal, the corporation whose interest they represent, we find that the action against Schott is barred. (*Cwerdinski* v. *Bent,* 256 App. Div. 612, 615, affd. 281 N. Y. 782; *Potter* v. *Walker,* 276 N. Y. 15, 26–27.)

We also decide that the trial court correctly refused to hold as to any individual defendant that this is an action to procure a judgment on the ground of fraud and, as such, governed by subdivision 5 of section 48 of the Civil Practice Act, which provides that the six-year period does not commence to run until discovery of the facts constituting the fraud.

We now consider the court's ruling which directed an accounting by Climax and by the defendant directors of American Metal (1) for permitting American Metal to refrain from engaging in the sale of molybdenum and (2) for permitting an improper use of its facilities and resources by Climax. In their complaint, plaintiffs merely sought compensation for such services as had not been paid for. The court, however, held that " The defendant Climax Company will be required to account for profits and benefits accruing to it in consequence of the wrongful conduct of the fiduciaries of the Metal Company, during a period of ten years prior to the commencement of this action ", and held the individual defendants liable only if Climax failed to pay.

The trial court was apparently of the belief that American Metal should have gone into the molybdenum business and that its directors violated their duty by causing American Metal to refrain from engaging in the business of steel alloys, including molybdenum, after 1928. The court decided that American

Metal, solely to benefit Climax, refrained from entering into competition with Climax in the sale of molybdenum and discontinued the ore department through which it had previously sold molybdenum with profit, in order to leave the field exclusively to Climax. We are unable to accept these conclusions.

The Vogelstein group, who controlled American Metal after 1920, had no faith in molybdenum and were desirous of limiting American Metal's participation in Climax. Because it was losing money, they discontinued the ore department which had traded in molybdenum and other steel alloys at times during the war. When they forsook trading in molybdenum, the directors were not motivated by any purpose to benefit Climax. Their sole aim was to keep American Metal out of the business because they felt it was not profitable. American Metal was primarily a merchant and trader, and a smelter and refiner of the base metals, copper, lead and zinc; it had never been keenly interested in steel alloys. In 1915, the sales of the ore department, which had been established in 1910, were only about 1% of the company's entire business. The head of the ore department was Hans Bernstorff, one of the defendants. That department simply engaged in trading. During the war years its business was extensive, but it became unprofitable. In 1921 there was a loss of $100,000; later, there was a tremendous nitrate trading loss of $3,000,000. American Metal thereupon completely abandoned its ore department and, in 1923, gave up all trading in steel alloys. Vogelstein insisted that Bernstorff, who was manager, sever his relationship with American Metal. A new company was thereupon organized by Bernstorff, known as the Ore & Chemical Corp., which was to take over the business of the ore department. American Metal invested $50,000 and Bernstorff a like amount. Vogelstein insisted that American Metal's liability in the newly formed corporation be limited to a maximum of $50,000. In 1924, American Metal sold its investment in Ore & Chemical Corp. to Bernstorff for his note, which the latter never paid. Bernstorff eventually lost all of his capital.

At the time the board of directors of American Metal decided to discontinue the ore department, the Climax mine was still closed. Clark and Vogelstein desired to terminate what Vogelstein denominated " outside ventures " in the best interests and welfare of American Metal. American Metal could not compete with Climax even if it had wished to do so, because there was no market of any consequence until Climax developed it after 1925, and because American Metal had no molybdenum

to sell. It could only obtain molybdenum by buying it from Climax or from some other producer and reselling at a higher price. We are unable to find facts in the record sufficient to support a conclusion that defendants caused American Metal to refrain from competing with Climax in the sale of molybdenum.

Climax and the individual defendants were also commanded to account for the proportions of the gains and profits realized by Climax, which were attributable to the use of the resources and facilities furnished by American Metal in the development of Climax during the ten years preceding the commencement of this action. The trial court restricted the accounting to this period because it held that the Statute of Limitations barred any recovery for an earlier time. The direction to account was grounded upon the theory that '' the success of the Climax Company was due in large part to the efforts of the highly paid directors and officers of the Metal Company and through the employment of its funds, credits and facilities, * * *.''

Our holding is that the success of Climax was due to the efforts of its own executives and to the use of its own resources and facilities. Through the years American Metal, of course, assisted the development of Climax by financing and permitting the use of its employees for the development of Climax. However, a careful record was kept of all services rendered by American Metal to Climax and the latter was charged therefor. Ordinary business courtesies were fully reciprocated. The evidence establishes that the relationship between the two companies was characterized throughout by good faith and adherence to high standards of business conduct. American Metal was in no sense a competitor of Climax. The success of Climax was due essentially to its own efforts and to its own persistence.

The men really interested in molybdenum were Phillipson, a chemical engineer, who was president of Climax until his death in 1930, and Schott, who was elected its president in 1931. Each had the greatest faith in it. Under the direction of these two executives, the market was developed. Exhaustive metallurgical research and constant experimentation leading to the right uses of molybdenum, opened up unexplored fields in the steel alloy industry. Repeated demonstrations to prospective customers created a demand sufficient to warrant large scale production. For this purpose, Climax had employed many metallurgists, had maintained its own research and testing laboratory and had operated sales offices in all parts of the country. Phillipson, during the years he was president of Climax, labored indefatigably to set up a demand for molybdenum in foreign and

domestic markets. With the aid of sales agents, he developed the European business. In the domestic field, the market was built up by Climax metallurgists after approval in 1925 of the use of molybdenum by the Society of Automotive Engineers. By 1928, Climax's ability to produce and deliver molybdenum could not be questioned. It had established a market for the metal both here and abroad; it functioned as a completely independent organization. American Metal produced no molybdenum and had none to sell. Domestic consumers, after 1928, purchased molybdenum from Climax since there was no other source available to them in the quantities desired.

Climax only started to become successful in the year 1925. However, adverse business conditions beginning with 1929 had delayed its success on a large scale until 1933, in which year for the first time in its history it paid a dividend. When Schott had been chosen president of Climax in 1931, shortly after the death of Phillipson, Climax maintained separate offices and separate banking facilities. Between 1916 and 1938 Climax paid American Metal a total of more than $1,000,000 by way of interest and apportionment of the facilities and employees' services.

American Metal, as the largest single stockholder in Climax, had a substantial investment in it. When this action was commenced, American Metal held 225,000 shares of Climax having a market value of $13,500,000. It had been repaid $387,000 in debentures with $184,000 interest. It had received dividends totalling $2,508,564 and in 1938 it realized about $260,000 from the sale of 6,690 shares of stock. With this great financial interest of American Metal in Climax, it was to be anticipated that officers of American Metal would also be officers of Climax. Officers and directors of American Metal not only had the right but were under a duty to act as directors, rendering such services as were necessary. They committed no wrong in entering into reciprocal arrangements for the supplying of information and technical data and for the exchange of routine services mutually beneficial to both companies. It seems scarcely fair to say that it was improper for the directors of American Metal to do anything to promote Climax when American Metal had such a large stake in Climax.

The law is well settled that minority stockholders may not interfere with the management of a corporation so long as the trustees are acting honestly and within their discretionary powers. (*City Bank F. T. Co.* v. *Hewitt Realty Co.*, 257 N. Y. 62, 68.) The fact that defendants as holders of Climax stock

might have indirectly profited by the reciprocal arrangements between Climax and American Metal which were beneficial to American Metal, does not justify the judgment imposed by the court, particularly where, as here, the arrangement enhanced the investment of American Metal. In *City Bank F. T. Co.* v. *Hewitt Realty Co. (supra)*, at page 68, POUND, J., said: " A minority stockholder has no standing to set aside corporate acts of the directors with one of their number where such acts are not tainted with fraud and are made openly and in good faith, even though the contracting director eventually makes a profit therefrom. (*Hine* v. *Lausterer*, 257 N. Y. 523.) As he may not annul such action, he cannot compel the directors to accept his judgment in matters of discretion.

" ' The plaintiff is in the position of all minority stockholders, who cannot interfere with the management of the corporation so long as the trustees are acting honestly and within their discretionary powers.' (*Burden* v. *Burden*, 159 N. Y. 287, 308.) "

Upon the evidence, we cannot say that the directors of American Metal have been faithless to their trust. Though some were also directors of Climax and owned stock in Climax, the mere existence of such a divided loyalty did not, of itself, warrant the imposition of liability against the directors. (*Goldstein* v. *Tri-Continental Corp.*, 282 N. Y. 21; *Everett* v. *Phillips*, 288 N. Y. 227; *Weinberger* v. *Quinn*, 264 App. Div. 405, affd. 290 N. Y. 635.) In *Goldstein* v. *Tri-Continental Corp. (supra)* the court said (LOUGHRAN, J.), at pages 27–28: " The plaintiff would have the court say that when directors-in-common of a parent corporation and its subsidiary are acting on the board of the subsidiary, their votes (irrespective the merits and no matter what the consequences to the subsidiary) must be cast in the sole and exclusive interest of the parent corporation. This generalization, we think, is obviously unsound. No authority cited goes so far and the most relevant decision we have found looks the other way. (*Continental Ins. Co.* v. *N. Y. & H. R. R. Co.*, 187 N. Y. 225.) "

The decision of the directors of American Metal to render such assistance to Climax as it did, was fully justified. Climax made no profits " at the expense " of American Metal and the success of the former, far from being a detriment to American Metal, resulted in a net profit to American Metal of more than $16,000,000. Upon an examination of all the evidence, we hold that Climax amply compensated American Metal for the use of its resources, facilities and services from December, 1928, up to the time of trial, and that such reciprocal

services which were rendered and not paid for were hardly of a character that should be regarded as compensable.

In any event, any services of the officers or employees of American Metal which were utilized by Climax and which were not paid for might, of course, render Climax liable for the value of such services in an action for damages. No partnership or trust relationship was created through the rendition of such services and no accounting for profits made by Climax in digging its ore out of the earth, milling it and selling it, will lie here in favor of American Metal. A wrongdoer does not forfeit his property or the profits arising thereunder merely because he wrongfully utilizes the services of another. The correct rule is enunciated in section 152 of the Restatement of the Law of Restitution, as follows:

" § 152. Value of Services Acquired by Consciously Tortious Conduct.

" Where a person is entitled to restitution from another because the other has obtained his services, or services to which he is entitled, by fraud, duress or undue influence, the measure of recovery for the benefit received by the other is the market value of such services irrespective of their benefit to the recipient."

The liability of Climax could only be for the value of the facilities and services of which American Metal had been deprived. This was plaintiffs' claim in their complaint. There is no authority for the finding that Climax took the molybdenum business away from American Metal, for the latter never owned that business. All that Climax could be called upon to pay is the value of any services rendered to that company. Of such liability on the part of Climax, there is insufficient proof.

The trial court has also found that the individual defendants who were directors and officers of American Metal when the alleged wrongful acts by Climax were committed, must account for the consequences of their alleged wrongs. We agree with the law as stated by the trial court, that directors of a corporation by virtue of the fiduciary position they occupy may not profit improperly at the expense of their corporation and that transactions entered into by directors in a dual capacity constituting a divided loyalty will be scrutinized carefully and invalidated where they appear to be unfair. However, we do not find that defendant directors acted unfairly or that they improperly profited. The decree requiring Climax and the individual defendants to account to American Metal for the use of the facilities and resources of American Metal and because

American Metal was caused to refrain from dealing in molybdenum, is not justified by the evidence.

The individual defendants risked large sums in the Climax enterprise, remained with their investments during many disastrous years and paid all obligations to American Metal in April, 1924, when Climax was still a losing venture. Now that the speculation has finally met with phenomenal success, there is no warrant for interference with their interests by holders of recently acquired stock, suing on behalf of American Metal.

In retrospect, the prospects of Climax did not definitely brighten until 1925. Up to that time, Climax had sustained losses year after year. It had taken five years of intensive research and development work, directed by the executive head of Climax, before an adequate market could be found to warrant the reopening of the mine in September, 1924. By that time, the net loss of Climax amounted to a cumulative total of $987,116.03. The individual participants had to bear the major share of these losses. In every year since 1927 Climax has made a profit. The meteoric rise of its net gains, however, came when they rose from $89,000 in 1932, to $900,000 in 1933, to $1,800,000 in 1934, to over $3,000,000 in 1935, and to almost $8,000,000 in 1938. Then came this law suit.

As the learned trial court pointed out, many of the principal participants in the transactions complained of had died. Berthold Hochschild, who headed American Metal in 1916–1917 and whose decision controlled the initial acquisition by the individual defendants of their respective participations; Brainard F. Phillipson, president of Climax until 1930; Ludwig Vogelstein, the managing head of American Metal from 1920 up to 1934 and who determined against making any further investment in Climax in 1920 by acquiring the interest of defendants in Climax; Julius Goldman, attorney for American Metal; Sir Woodburn Kirby, liquidator of the English companies; and Sam Baer who was a managing director of Henry R. Merton & Co., had passed away years before the commencement of this action. Deceased also were Joseph B. Cotton, who was counsel to American Metal, Theodore Stanfield, L. T. Haggin, who was president of Cerro de Pasco Co., J. P. Grier and J. Horace Harding, who was senior member of C. D. Barney & Co. The last four named were completely disinterested directors of American Metal. Andrew W. Mellon and E. C. Converse, directors elected in 1918 at the request of the Alien Property Custodian, were also dead at the time of the trial. Many other witnesses, too, had passed away. The rule that a court of

equity will not aid a party guilty of gross laches " is peculiarly applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transactions complained of, or of the witness or witnesses, or by reason of the original transactions having become so obscured by time as to render the ascertainment of the exact facts impossible." (*Hammond* v. *Hopkins,* 143 U. S. 224, 250; see, also, *Hynes* v. *Silver Prince Mining Co.,* 86 Mont. 10, 17; *Salvo* v. *Coursey,* 220 Ala. 300, 302; *Dunham* v. *Adams,* 82 N. J. Eq. 265, 270.)

What was stated by the court in *Whittemore Bros. Corporation* v. *Ramsey* (300 F. 576) is singularly apposite here (p. 579): " Witnesses who knew the facts have died; memories have grown dim; records have disappeared; the evidence which 20 years ago would have been clear and decisive is now vague or lost. During this inaction by the plaintiff the defendant and its predecessors have gone ahead and built up their business. If the case required it, I should be inclined to say that this ground alone is sufficient to bar the plaintiff from the broad relief in equity which it seeks."

The necessity for diligence in this case is emphasized by the doubt as to the alleged wrong perpetrated by the defendants, the change of circumstances between the commission of the alleged wrong and the assertion of the claim, the change of position by defendants in reliance upon the acquiescence of all directors and substantially all of the stockholders, the absence of injury to corporate property and the fact that plaintiffs now seek to profit by the extraordinary success of defendants in a speculative enterprise. " The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit." (*Twin-Lick Oil Co.* v. *Marbury,* 91 U. S. 587, 593; see, also, *Patterson* v. *Hewitt,* 195 U. S. 309, 319; *Gildersleeve* v. *New Mexico Mining Co.,* 161 U. S. 573, 578; *Sunny Brook Zinc & Lead Co.* v. *Metzler,* 231 F. 304, 311.)

It is to be noted, too, that in spite of the success ultimately achieved by Climax, none of the many who approved the rejection of the 1920 offer to sell to American Metal the stock of the individual participants at cost nor any subsequent board of directors have questioned the propriety of that decision nor have they attempted to deprive those who took that exceptional risk of the fruits of their venture. Not until this action was brought late in 1938 has any other stockholder of American

Metal sought to repudiate its election not to buy, so openly made some two decades before.

The law does not presume fraud; it must be proved. In the absence of proof that the disinterested directors and executives of American Metal acted in bad faith, we may not assume that they were not guided by sound business reasons. There may be no judicial interference with actions by directors and executives where good faith and honest judgment dictate the decisions made. A study of the voluminous record and the hundreds of exhibits leads us to conclude that there is no evidence to warrant a determination that defendant directors, in performing the acts complained of by plaintiffs, did not exercise honest business judgment for the benefit of their stockholders.

In conclusion, we hold there was no breach of fiduciary duty when the individual defendants assumed 90% of the Climax venture and American Metal assumed 10% thereof; that no corporate opportunity was involved and that if a corporate opportunity existed, it was rejected by American Metal in 1920; that as to all defendants the complaint should be dismissed on the merits; that, in any event, the Statute of Limitations is a complete bar as to all individual defendants and that the judgment which disposes of plaintiffs' claim, by so holding with respect to all defendants except Schott, should be affirmed.

As to defendant Schott, we decide that he violated no duty owing to American Metal when he participated in the Climax venture; further that any claim against him is barred by the ten-year Statute of Limitations.

Insofar as Climax is directed by the judgment to account, we find that no fiduciary relationship ever existed between Climax and American Metal, and we further find that there was no improper use of the resources, facilities and services of American Metal in the development of Climax, nor was there any proof that American Metal refrained from engaging in the business of steel alloys, including molybdenum, to aid Climax.

As to plaintiffs' cross appeal from the judgment, we have examined each of the points raised and we find them to be without merit. Upon plaintiffs' cross appeal, the judgment is in all respects affirmed.

The orders appealed from should be affirmed.

The judgment of the trial court, except as hereinbefore indicated, should be reversed, with costs, and the complaint dismissed as against all defendants, upon the merits, with costs.

MARTIN, P. J., TOWNLEY, GLENNON and CALLAHAN, JJ., concur.

Judgment, so far as appealed from by the defendants, Climax Molybdenum Company and others, unanimously reversed, with costs, and the complaint dismissed as against all defendants, upon the merits, with costs, and, so far as appealed from by the plaintiffs, unanimously affirmed. Orders appealed from unanimously affirmed. Settle order on notice. The findings inconsistent with this determination should be reversed and such new findings made of facts proved on the trial as are necessary to sustain the judgment hereby awarded.