521 A.2d 1205

**James L. GAY, Jr.**

v.

**STATE OF MARYLAND DEPOSIT INSURANCE FUND CORPORATION, Receiver for Old Court Savings & Loan, Inc.**

**No. 77, Sept. Term, 1986.**

Court of Appeals of Maryland.

March 6, 1987.

Thomas L. Crowe, Baltimore (Sharon V. Burrell and Cable, McDaniel, Bowie & Bond, Baltimore, on the brief), for appellant.

Jay I. Morstein, Baltimore (Shale D. Stiller, Deborah L. Robinson and Frank, Bernstein, Conaway & Goldman, Baltimore, on the brief), for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH, McAULIFFE and ADKINS, JJ.

RODOWSKY, Judge.

By summary judgment the trial court ordered the appellant, James L. Gay, Jr. (Gay), to transfer his interest in certain corporate stock to the insolvent service company of an insolvent savings and loan association. The appeal potentially raises intriguing issues involving contracts, specific restitution, fiduciary duties, conflict of interests, and

constructive trusts, but we shall reverse primarily based on the rules of summary judgment procedure.

Appellee, the plaintiff below, is State of Maryland Deposit Insurance Fund Corporation (MDIF) in its capacity as receiver for Old Court Savings & Loan, Inc. (Old Court).[1] The Circuit Court for Baltimore City had placed Old Court in conservatorship on May 13, 1985, and in receivership on November 8, 1985. That same date the receiver, MDIF, filed a 142 page amended complaint against the former president of Old Court, Jeffrey A. Levitt (Levitt), and thirty-eight other defendants. This appeal involves one aspect of one transaction embraced in that amended complaint.

The subject transaction concerns a partially developed residential community in South Carolina known as Tega Cay. The stock which MDIF seeks from Gay represents two and one-half percent of the outstanding shares in both the private corporation furnishing utility services, and in the corporation owning recreational facilities, at Tega Cay. To the extent that the receiver has been able to reconstruct the transaction, it generally proceeded in the following manner.

Sometime prior to August 9, 1984, Old Court became interested in developing Tega Cay in conjunction with Edward R. Oppel (Oppel), a builder who had apparently been active in that community. The properties comprising Tega Cay, insofar as this case is concerned, were owned by four South Carolina corporations, TC 126, Inc., TC 22, Inc., TCU, Inc. (TCU), and Tega Cay Recreation Company, Inc. (TCRC). TC 126, Inc. owned 471 finished building lots and a large tract of undeveloped land. TC 22, Inc. had been established in a prior bankruptcy proceeding involving the development. TCU is the private utility company and TCRC owned two golf courses, two swimming pools, and a clubhouse. All of

---

1. The collapse of Old Court and the creation of MDIF are sketched in *Chevy Chase Savings & Loan v. State,* 306 Md. 384, 509 A.2d 670 (1986).

the stock of each of these four corporations was in turn owned by a Netherlands corporation, Stanwick B.V. On August 9, 1984, Stanwick B.V. entered into a written contract with Tega Cay Development Co., Inc. (TCDC) to sell to the latter all of the stock of the four corporations for $5 million, of which $500,000 was paid as a downpayment.

TCDC is a South Carolina corporation which was formed on the day its contract with Stanwick B.V. was signed. The receiver now agrees that Oppel owned and owns forty percent of the stock of TCDC. The remaining sixty percent was and is owned by Old Court's wholly owned subsidiary, Old Court Investment Company, Inc. (OCIC). The Stanwick B.V. contract was signed for TCDC by Gay, as its vice-president. Gay, according to the allegations of the amended complaint, was vice-president of Bankers Realty, Inc. (Bankers), a wholly owned subsidiary of Meridian Mortgage Investment Corp. (MMIC), which in turn was a wholly owned subsidiary of OCIC.

Closing of the contract with Stanwick B.V. took place on October 2, 1984, in New York City. The settlement sheet reflects that Old Court loaned TCDC $7 million, including the $500,000 deposit. The difference between the $7 million loan and the $5 million purchase price is of general interest to the receiver. Part of that difference consists of two $50,000 disbursements, recorded on the settlement sheet as paid respectively to TCRC and to TCU.

Gerald Katz, Esquire (Katz) was the attorney representing the Old Court interests in the Tega Cay transaction. Katz testified on deposition that the transaction was modified on the buyer's side from that evidenced by the contract with Stanwick B.V. He said that the decision was made "internally" that Old Court did not want the stock of TCU and TCRC. It was to be assigned to someone else. When the closing was completed on October 2, 1984, nobody knew how the stock in the four entities was ultimately to be held. Both TCU and TCRC were producing very substantial losses. TCU had not obtained its final rate approval and it

would be many years before it stood on its own. Substantial capital was required for both companies to continue in existence. Further, it might not have been proper for OCIC to own TCU and TCRC. At some point a decision was made, as Katz described it, that TCU and TCRC would be owned by a "group of individuals and they would agree to make a substantial capital contribution to those entities."

Oppel, who signed the settlement sheet for the $7 million Old Court loan as "General Partner" of TCDC, was also deposed. He had been primarily interested in building homes at Tega Cay and had no desire to be an owner of either the recreation or the utility company. He knew that TCDC would not own TCU and TCRC. He assumed that the significant losses of those two companies were of some benefit to Old Court.

In an affidavit Gay states that during August 1984 Levitt had asked him to devote substantial time to overseeing the Tega Cay project on a fee per lot sold, plus bonus, basis of compensation. He attended the October 2, 1984, closing in New York. Gay further makes oath that

[i]n late October, 1984, Jeffrey Levitt stated that the work to be done in Tega Cay was greater than had been anticipated and that in addition to other duties, he wanted me to oversee work for TCRC and TCU. In exchange for my increased work on the overall project and my additional duties for TCRC and TCU, Levitt stated that I would have a ten percent (10%) interest in TCRC and TCU.

Gay affirms that he supervised a $100,000 renovation of the TCRC clubhouse, the redesign of several holes on the golf course, hired a landscape architect, and purchased new golf carts. He states he had "responsibility for upgrading and increasing the capacity of the [TCU] sewage treatment plant; the design and installation of additional sewer and water mains and service lines and securing permission from local government authorities for these and other related activities." It was his "understanding that the consideration [he] gave for the issuance of shares in TCRC and TCU

was to have been the services [he] performed for each corporation."

Under cover of a letter dated January 23, 1985, Katz caused to be transmitted to Gay at Bankers' offices in Baltimore the corporate paperwork on the Tega Cay transaction. Included were the organizational minutes of TCDC. These minutes are in the form of informal action by the directors named in the articles of incorporation. They were prepared for signature by Levitt, Dennis E. Guidice (Guidice), and Gay.[2] Gay has signed the minutes but Levitt and Guidice have not. The minutes recite that the directors elect Oppel as president and Gay as vice-president of TCDC and an Anne Marie Buscemi as secretary-treasurer. The minutes also contain the following resolution:

> That the Corporation hereby assigns its rights to purchase the stock of TCU, Inc. and Tega Cay Recreation Company, Inc. to Jeffrey A. Levitt (for himself and for the benefit of James L. Gay, Jr.), Jerome S. Cardin, Allan H. Pearlstein and Edward R. Oppel (and Jeffrey A. Levitt) in return for the favorable commitment it has received from them to invest at least $100,000 in new capital for each corporation[.]

The statement of informal action concludes: "This written consent signed by all of the members of the Board of Directors of the Corporation, shall be effective as of October 2, 1984[.]"

The Katz to Gay letter of January 23, 1985, also enclosed the stock certificates representing all of the shares in each of TCRC and TCU. The certificates were signed by Levitt as president. Three hundred forty-five shares of each corporation were respectively issued to Levitt and to Allan H. Pearlstein (Pearlstein) who is described in the complaint as effectively owning forty-one percent of Old Court; 160

---

**2.** The amended complaint alleges Guidice was a director of Old Court and its executive vice-president, a director and the vice-president of OCIC, a director of MMIC, and a director and vice-president of Bankers Realty.

shares of each were issued to Jerome S. Cardin (Cardin), described in the complaint as effectively owning eighteen percent of Old Court; 100 shares of each were issued to Levitt and Oppel as tenants in common; and fifty shares of each were issued to Levitt and Gay as tenants in common.

After the list of enclosed certificates for stock of TCRC the Katz letter stated: "Please make certain that at least $100,000 has been paid in for new capitalization." The quoted words are repeated in that letter following its description of enclosed new stock certificates for the outstanding shares in TCU. The letter indicates carbon copies were sent to Levitt, Cardin, Oppel, and Pearlstein, to the Old Court accountant, and to counsel for Oppel.

Oppel said on deposition that he did not question anyone about the reference in Katz's letter to the $100,000 capital contributions. He "assumed that the $100,000 contribution was by individuals to meet some sort of savings and loan requirement of some nature, and [he] had no idea why that was a requirement."

Gay's undated affidavit filed January 7, 1986, includes the following:

I had not recalled that [the TCDC] organization minutes provided for the payment of any funds to TCRC or TCU for issuance of stock. *While I am still not certain whether the resolution requires that I make payment,* I am prepared to make any pro rata contribution to the capital of each of the companies. [Emphasis added.]

F. William Hargrove (Hargrove) made an undated affidavit filed by MDIF in which he describes himself as "project manager of Tega Cay [and] custodian of the books and records of TCRC and TCU." He affirms that none of Pearlstein, Cardin, Gay, or Oppel paid anything into TCRC or TCU, but that in November 1984 Levitt "deposited $50,-000 into the accounts" of those two corporations by two checks. They are drawn on Levitt's "Real Estate Escrow Account." The record does not reflect whether this is the same $100,000 disbursed in two $50,000 increments marked

to TCU and TCRC on the Old Court to TCDC loan settlement sheet. Hargrove's affidavit states that, in writing on four occasions between August 21, 1985, and November 22, 1985, and orally on more frequent occasions, he made demands "for funding of TCU and TCRC to Mr. Mike Killian as agent for Levitt Pearlstein Management Co., Inc.," without response. There is no indication that Killian was an agent for Gay.

The conservator for Old Court had disputed Oppel's claim to forty percent ownership of TCDC. By a written agreement dated October 30, 1985, that dispute was settled. Under that settlement Oppel had ninety days, called the "Paragraph 2 period," within which to find a purchaser for Tega Cay who would commit to fully repaying Old Court approximately $7,792,000 of principal and $1,200,000 of unpaid interest. If Oppel obtained that commitment, the conservator agreed, *inter alia*, to "[a]ssign to Oppel any rights [Old Court might] have against the alleged stockholders of" TCRC and TCU.[3] The settlement agreement with Oppel additionally provides in relevant part:

5. After the Paragraph 2 period, Oppel grants to Old Court the right to sell all or substantially all of the property owned by TCDC and its subsidiaries[.]

. . . .

10. This Agreement does not abrogate any of Old Court's claims against the miscellaneous defendants in *MDIF v. Levitt* or Oppel with respect to the ownership of [TCRC or TCU]. Oppel agrees that within 10 days after this Agreement is signed, he will promptly assign to Old Court all of his stock in [TCRC and TCU]. If Oppel exercises his rights under Paragraph 2, Old Court will reassign that stock to him. . . . Old Court agrees not to join Oppel in *MDIF v. Levitt* with respect to any matters arising out of the Tega Cay transactions.

---

**3.** In the Oppel settlement agreement "Old Court" includes OCIC.

By the vehicle of a summary judgment granted on the foregoing record, MDIF obtained an affirmative injunction directing Gay to execute stock powers assigning to OCIC, separate from the certificates, all of his interest in the fifty shares respectively held by him with Levitt, as tenants in common, in TCU and TCRC. Because it was undisputed that the $100,000 contributions to the capital of TCU and TCRC had not been made, the circuit court concluded that summary judgment was appropriate on the following analysis:

> [T]here is no doubt that the recreation company and the utility company were part and parcel of the planned development and needed for the planned development of the Tega Cay community, you can't sell lots without having utilities. And since it was supposed to be basically a recreational community, many of the lots being waterfront lots, the need for a recreation company is also fairly essential in order to properly market the lots.
>
> So, Old Court, through [TCDC] gave up the opportunity to acquire these two essential communities of the development so that people who would have the resources to make these two units functional should do so.
>
> They gave up their opportunity to acquire these units directly because of that. And the defendants were to put in, in order to get stock in the utility company or the rec company, they were to put $100,000 into each. It is undisputed that the defendants had put nothing into the utility company or into the rec company, and the whole premise upon which Old Court allowed the acquisition of these two companies has been negated by the nonperformance of the defendants.
>
> In short, the basis upon which the diversion was allowed has not taken place. And you end up with, therefore, an improper diversion of corporate opportunity by Mr. Gay.

Gay appealed from the injunction issued against him and we granted certiorari on our own motion prior to consideration of the matter by the Court of Special Appeals.

Gay submits two issues which spawn subissues. Broadly they are that the claim asserted by MDIF is that of TCDC which is not a party to the action and that the record does not support a summary injunction for alleged diversion of corporate opportunity.

## I

A fundamental obstacle to summary judgment in this case is the conflict over the terms of the contract relevant to Gay's acquisition of his interest in the subject stock. MDIF proceeds on the theory that the TCDC minutes, intended to be effective as of October 2, 1984, and signed by Gay after January 23, 1985, are conclusive on that question. Underlying this position is the premise that the minutes unambiguously make Gay a promisor, presumably jointly and severally with others, to pay $100,000 to each of TCU and TCRC. Gay on the other hand makes oath that he agreed, apparently orally, with Levitt to undertake duties at Tega Cay for TCU and TCRC in consideration of the promise of stock in each of those companies.

■ Inasmuch as Gay is the party opposing summary judgment, permissible inferences most favorable to Gay from the known facts should ordinarily be drawn. From Katz's testimony it could be found that sometime after October 2, 1984, the individuals who would acquire the stock were determined. Based on Gay's testimony, as reflected by his affidavit, a fact finder could infer that, in the conversation of late October 1984 between Levitt and Gay concerning stock for services, Levitt was speaking either individually, as a stockholder in TCRC and TCU, or as agent for all the then stockholders of TCRC and TCU, a group which did not then include Gay. It is inferable that that group took the subject stock from TCDC in consideration of contributions to capital, while Gay, in turn, took his interest from one or more members of that group for his promise of services to the corporations.

MDIF argues that Gay cannot create a genuine issue of material fact by filing an affidavit which contradicts the minutes distributed on January 23, 1985, and thereafter signed by him. We choose not to rest our answer to MDIF's argument exclusively on the ground that it raises a credibility issue which cannot be resolved on summary judgment. In addition, we find the minutes ambiguous. The TCDC directors' resolution recites present assignment by TCDC of "its rights to purchase the stock of TCU, Inc. and [TCRC] to Jeffrey A. Levitt (for himself *and for the benefit of James L. Gay, Jr.*), Jerome S. Cardin, Allan H. Pearlstein and Edward R. Oppel (and Jeffrey A. Levitt) in return for the favorable commitment it has received from *them* to invest at least $100,000 in new capital for each corporation[.]" (Emphasis added). It cannot conclusively be said on this record that the resolution was intended to be a written integration of the contract to assign stock by TCDC. The resolution is at best evidence of the agreement. On its face that document treats Gay differently than it treats the other individuals mentioned. Gay is referred to only parenthetically and then as a beneficiary of an assignment made to Levitt. One interpretation is that Gay is not a promisor of the new capital, but that Levitt is a promisor, both for his and for Gay's benefit. Simply as a matter of interpreting the writing, the individuals to whom "them" refers, meaning the individuals from whom TCDC received a favorable commitment, may, or may not, include Gay. Gay's affidavit is consistent with a reading of the resolution which excludes him as a promisor in privity with TCDC.

■ MDIF also raises the statute of frauds section of the "Investment Securities" title of the Uniform Commercial Code as a bar to Gay's claiming any rights in the subject stock based on an oral agreement made with or through Levitt. Both Md.Code (1975), § 8–319 of the Commercial Law Article and South Carolina Code (1976), § 36–8–319 provide, in part, that "[a] contract for the sale of securities is not enforceable by way of action or defense unless ... [d]elivery of the security has been accepted[.]" Even if

Gay's defense to MDIF's claim involves "[a] contract for the sale of securities" within the meaning of § 8–319 of the U.C.C., the January 23, 1985, letter from Katz to Gay enclosing certificates for the TCRC and TCU stock evidences delivery and prevents summary judgment based on the statute of frauds argument.

## II

If the resolution in the minutes prepared for TCDC's directors is taken conclusively to have established that Gay is a promisor in privity with TCDC as promisee, Gay nevertheless submits that summary judgment was improper because TCDC is not a party to this action. Gay's argument rests on a premise, which MDIF does not contradict, that an order of the Circuit Court for Baltimore City of July 8, 1985, limits MDIF to exercising the powers of Old Court and of any corporation in which Old Court has a 100% ownership interest, directly or through first, second, or third tier subsidiaries. OCIC is a 100%, first tier, subsidiary of Old Court, but OCIC owns only sixty percent of TCDC.

Thus, the claim for breach of the promise to pay, Gay argues, is that of TCDC for which MDIF does not act as receiver. Nor may MDIF, even though it is receiver for a stockholder in TCDC, assert as a stockholder's claim that which is TCDC's claim for injury to it. *See Indurated Concrete Corp. v. Abbott*, 195 Md. 496, 74 A.2d 17 (1950); *Waller v. Waller*, 187 Md. 185, 49 A.2d 449 (1946). Finally, this action cannot be viewed as a derivative suit brought for the benefit of TCDC by MDIF, the receiver for OCIC, a stockholder of TCDC, because the relief is not restoration of the subject stock to TCDC. Rather, MDIF obtained an order for Gay to assign the subject stock to OCIC.

MDIF counters this analysis by confession and avoidance. The receiver points to its settlement agreement with Oppel, and particularly to the provision under which Oppel assigns to the receiver his interest in TCRC and TCU stock. That assignment is not, however, an explicit assignment by Oppel, as a forty percent stockholder of TCDC, of Oppel's

interest in TCDC's possible claim against other assignees of the securities transferred by TCDC.

■ We express no opinion whether paragraphs 5, 10, or any other provision of the settlement agreement with Oppel might be construed or interpreted, with the aid of appropriate fact-findings, to effect in substance an assignment to OCIC of any claim TCDC might have against its assignees with respect to the subject stock. It is sufficient for present purposes to note that the settlement agreement does not address those possible claims with sufficient clarity to permit summary judgment and to eliminate resort to the general background facts which, as reviewed in Part I hereof, are conflicting, at least as to Gay.[4]

### III

In this part we address the analysis applied by the trial court which rests directly on rights attributed to Old Court.[5]

---

**4.** We note, but do not reach, a further problem. Were the receiver successful at trial in placing OCIC in TCDC's shoes and in placing Gay in privity with TCDC, then MDIF's analysis would present a third-party beneficiary contract in which Gay is a promisor, TCDC is promisee, and TCU and TCRC are third-party beneficiaries. TCDC has delivered the stock in consideration of a promise to pay money to TCRC and TCU, but the promisors have not paid the money. The receiver, purportedly exercising the rights of TCDC, seeks specific restitution of the stock. There is no evidence that TCDC, as seller, took any security interest and the claimed default is solely on a promise to pay money. I.G. Palmer, *The Law of Restitution* § 4.11, at 465 (1978) submits that under those circumstances in a third-party beneficiary contract "[s]pecific restitution probably would be refused ... for the same policy reasons that lead to the refusal of such relief in a two-party transaction[.]" In the two-party transaction, "[e]nforcement of the money promise gives the plaintiff the consideration he bargained for in return for his performance" and "[t]he general policy of holding parties to their contracts supports the refusal of restitution." *Id.*, § 4.3, at 379. Moreover, courts regularly refuse specific restitution to unpaid, unsecured sellers, most probably because of a refusal "to aid the seller to obtain something in the nature of security for the unpaid price when the legal order has provided ample means by which he could have obtained such security in the bargaining process." *Id.*, § 4.7, at 432 (footnote omitted).

**5.** Hereinafter we shall use "Old Court" to include OCIC as well.

This analysis avoids the difficulties due to TCDC's absence from the action, but it encounters other difficulties. In substance the trial court treated the opportunity to own the TCU and TCRC stock as property of Old Court which had been transferred to Old Court's fiduciaries on condition that the capital contributions be made, so that, when they were not, the right to the property reverted to Old Court.

Unlike the theory reviewed in Part II hereof, which utilizes specific restitution to attempt to recover the subject stock, the theory now under consideration rests on fiduciary relationships and seeks a constructive trust remedy to recover the stock. The receiver acknowledged at oral argument that summary judgment imposing a constructive trust would not be available here but for the lack of dispute concerning nonpayment. MDIF did not introduce proof in the trial court attacking the fairness, as structured, of the transaction by which TCDC transferred the subject stock to Levitt and others. Whether Levitt and others ever intended to make the promised capital contributions from their own funds, whether the two $50,000 payments from Levitt's Real Estate Escrow Fund are in fact monies loaned by Old Court to TCDC, and whether there is any significance to the apparent lack of security for the promise to pay money are all matters which might be addressed at a plenary hearing. The summary judgment motion in this case is obviously an effort to shortcut those complexities of proof.

Gay argues, based on Katz's testimony, that ownership of TCU and TCRC was not an opportunity in which Old Court was interested. The circuit court reasoned that Old Court was interested in the entire development of which the utility and recreational companies were essential parts. We shall assume that the circuit court could properly conclude on summary judgment that owning the two companies was an Old Court business opportunity.

It is also clear that Levitt was a fiduciary of Old Court who was dealing with his principal. It is not clear that Gay was an Old Court fiduciary. The trial court seems

to have so treated Gay, but MDIF's brief also refers to Gay "as an aider and abettor of Levitt, Cardin, and Pearlstein, each of whom owed a fiduciary duty to Old Court[.]" Gay's affidavit describes his initial duties at Tega Cay to have involved sales, with his compensation a fee per lot sold and the possibility of obtaining an unimproved lot at Tega Cay as a bonus. If we assume that those undertakings made Gay an agent of Old Court, one could properly infer that the agency did not extend to the affairs of TCU and TCRC. An agent can be a fiduciary only with respect to the subject matter of the agency. *See* Restatement (Second) of Agency, § 390 Comment d (1957). When, according to Gay, he later undertook additional duties at Tega Cay and rendered services to TCU and TCRC, he became an agent of each of those corporations. Those corporations could be found to have been owned then by Levitt and others. Even if we assume that Old Court is entitled to a constructive trust on the TCU and TCRC stock held by Levitt and others, Gay's interest in his stock, under Gay's version of the facts, may be found to be derivative from Levitt, and possibly from other fiduciaries of Old Court.

The general rule as to the liability of third parties dealing with a fiduciary is set forth in 5 A. Scott, *The Law of Trusts* § 506, at 3568–69 (3d ed. 1967), reading in relevant part:

> Where a person in a fiduciary relation to another violates his duty as fiduciary, a third person who participates in the violation of duty is liable to the beneficiary....

> Where a fiduciary wrongfully transfers to a third person property which he holds as fiduciary, the third person is chargeable as constructive trustee of the property unless he is a bona fide purchaser. He is chargeable as constructive trustee if he received the property with notice of the transferor's breach of duty or if he gave no value even though he had no notice. [Footnotes omitted.]

And *see Safe Deposit & Trust Co. v. Cahn*, 102 Md. 530, 62 A. 819 (1906); *Higgens v. Shenango Pottery Co.*, 279

F.2d 46, 53 (3rd Cir.1960); Restatement of Restitution, § 201(1) (1936). Gay's affidavit describes services as consideration for the transfer of stock to him. Consequently, we turn to the question of notice.

■ This record permits the inference that Gay was not on notice of a breach of fiduciary duty to Old Court. There is no direct proof that Gay participated in structuring the transaction, including the assignment from TCDC. The subject of fiduciary duties owing to corporations is factually and legally complex and Gay knew that the transaction was being handled with the advice of counsel.[6]

At the times relevant to this case transactions between a capital stock savings and loan association, as is Old Court, and a "controlling person," *i.e.*, one holding more than twenty percent of the voting shares, were addressed by Md.Code (1980), § 9–323 of the Financial Institutions Article. Section 9–323(d) (1) provided:

---

**6.** One commentator has divided the evolution of the attitude of courts toward dealings between director and corporation into three eras. *See* Marsh, *Are Directors Trustees? Conflict of Interest and Corporate Morality,* 22 Bus.Law. 35 (1966).

In 1880 it could have been stated with confidence that in the United States the general rule was that any contract between a director and his corporation was voidable at the instance of the corporation or its shareholders, without regard to the fairness or unfairness of the transaction. [*Id.* at 36.]

. . . .

It could have been stated with reasonable confidence in 1910 that the general rule was that a contract between a director and his corporation was valid if it was approved by a disinterested majority of his fellow directors and was not found to be unfair or fraudulent by the court if challenged; but that a contract in which a majority of the board was interested was voidable at the instance of the corporation or its shareholders without regard to any question of fairness. [*Id.* at 39–40 (footnote omitted).]

. . . .

By 1960 it could be said with some assurance that the general rule was that no transaction of a corporation with any or all of its directors was automatically voidable at the suit of a shareholder, whether there was a disinterested majority of the board or not; but that the courts would review such a contract and subject it to rigid and careful scrutiny, and would invalidate the contract if it was found to be unfair to the corporation. [*Id.* at 43.]

A controlling person may engage in a business or transaction with a capital stock association only if:

(i) A full disclosure of the business or transaction and the nature of the controlling person's interest is made to the board of directors of the capital stock association;

(ii) The transaction is approved in good faith by the recorded vote of the present and voting disinterested directors of the association; and

(iii) Any profits of the controlling person are not at the expense of the capital stock association and do not prejudice its best interests.

The receiver's brief makes the flat assertion that there was no compliance with this section, but the record is silent in that respect. Inasmuch as the receiver's proof did not go behind the decision to allow Levitt and others to acquire the TCU and TCRC stock, one simply cannot conclude on this record that Gay had to have been on notice that applicable statutes were not followed, at least in form.

Thus, the question before us is reduced to whether non-payment of the full consideration promised for the subject stock entitles Old Court as a matter of law to retake the stock, even from a potential bona fide purchaser. MDIF argues that the transfer by TCDC was conditional but the proposed minutes on which MDIF relies reflect a present transfer ("the Corporation hereby assigns") in consideration of a promise.

■ Whether a corporate fiduciary has breached the duty of loyalty to the corporation in a transaction with it is ordinarily determined as of the time of the transaction, and not by hindsight. *See Turner v. American Metal Co.*, 268 A.D. 239, 251, 50 N.Y.S.2d 800, 812 (1944); Walker, *Legal Handles Used to Open or Close the Corporate Opportunity Door*, 56 N.w.U.L.Rev. 608, 626 (1961). MDIF has to date eschewed using nonpayment as evidence of an intent never to pay, or as evidence of the precariousness, if any, of the transaction when it was made. The receiver has not cited any authority, and we have not found

any, for the proposition that the subject matter of an unconditional and unsecured credit sale by a corporation to a fiduciary, if fair when made, can be recovered *in specie* from a bona fide purchaser because full payment has not been made by the fiduciary. Although Levitt and other promisors breached their contract by nonpayment, it does not inexorably follow that there was a breach of trust as well. For all that the record shows, the transaction as structured may have been a permissible one for fiduciaries and the failure to pay may have been the result of squabbling among the assignees of the stock over the amount which each was to contribute.

We appreciate the public interest in expediting the liquidation of Old Court.[7] Nevertheless, the per se rule advocated to support summary judgment here would increase instability in transactions by third parties with fiduciaries and operate unfairly against bona fide purchasers. If the receiver is entitled to a constructive trust on Gay's stock, it will have to be established at trial.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY THE APPELLEE.

---

7. We are advised by MDIF in its brief that its claims to the TCU and TCRC stock against the other shareholders have been settled.