Frederic GUSSIN, Paul Gussin, Purace General Partnership

v.

Richard W. SHOCKEY, Jr.

Civ. No. PN–88–3213.

United States District Court,
D. Maryland.

Nov. 17, 1989.

Supplemental Opinion and Order
Nov. 24, 1989.

Douglas R. Marvin, Maureen T. Cannon, William M. Wiltshire, and Williams & Connolly, Washington, D.C., for plaintiffs.

Andrew M. Steinberg, Roy S. Lerman, and Lerman & Steinberg, Washington, D.C., for defendant.

## OPINION AND ORDER

NIEMEYER, District Judge.

Frederic Gussin and his father, Paul Gussin, entered into an arrangement with the defendant Richard Shockey under which Shockey agreed to assist the Gussins in buying, maintaining, breeding and selling thoroughbred horses. The Gussins, who were inexperienced "in horses," relied on Shockey's twenty years experience in buying and selling horses. When the Gussins discovered later that Shockey had taken what they characterize as kickbacks from sellers in transactions in which Shockey was representing the Gussins as buyers, the Gussins, individually and as partners, sued Shockey in six counts, alleging breach of fiduciary duty, fraud, and violations of RICO, 18 U.S.C. § 1961 et seq.

The plaintiffs have filed a motion for partial summary judgment as to liability on all counts and for damages on four counts claiming a total of $575,000. This is the sum of the alleged kickbacks that have been discovered to date. At the hearing in open court the plaintiffs abandoned all claims that could not be established by their motion for summary judgment. In their desire to have a final judgment, they abandoned the claims made under count three as to which they had not yet discovered their damages and their claims to all damages beyond the $575,000 identified, including claims for punitive damages. On this basis the Court will grant summary judgment in favor of plaintiffs for $575,000 and will dismiss the remaining claims that have not been established.

### I

### Undisputed Facts

In September 1984 Shockey approached the Gussins and suggested that they should purchase a thoroughbred mare named "Purace." At that time, the Gussins had never owned a horse and were not

experienced in the horse business. After several meetings, the Gussins and Shockey entered into an oral arrangement, the terms of which neither side disputes. Shockey agreed to help and advise the Gussins in purchasing horses, placing insurance on them, boarding and caring for them, breeding them, and selling them. Shockey conceded that under the arrangement he was to tell the Gussins "what to do"; he was to "manage their affairs." For these services Shockey was to receive a fee in the amount of five percent on the net profits derived from the sale of horses. The fee was to be paid at the time each horse was sold by the Gussins and was to be computed on the sales price of each horse less expenses that included the purchase price of the horse, insurance costs, and the boarding, training and stud fees.

Although Shockey was reluctant to characterize his role as that of a formal agent of the Gussins, he did allow that he was an agent for them in the everyday meaning of the word. Documents he executed confirm his role as agent for the Gussins. They include: (1) a Memorandum of Bill of Sale for horses named Past Example and Swift Response, signed "Richard Shockey, Agent for Frederic Gussin"; (2) a Memorandum of Bill of Sale for an unnamed foal by horses named Forli and Past Example, signed "Richard Shockey, agent for Paul and Frederic Gussin"; (3) a Livestock Proof of Loss (insurance claim), signed "Richard Shockey, Agent for Paul & Frederic Gussin." In response to requests for admissions he also conceded he was acting as agent for the Gussins.

After the Gussins entered into this agency relationship with Shockey, they formed a business partnership between themselves to conduct their horse business called Purace General Partnership. It is not clear what role the Partnership played, because Shockey seems to have been acting for one or both of the Gussins individually on each of the transactions according to the documentation submitted. The allegation is that the Gussins held title to the horses in the name of the Partnership.

The agency relationship between the Gussins and Shockey continued from September 1984 until November 1985 when the Gussins ended it. On November 8, 1985, they wrote a letter to Shockey stating:

> This letter is to serve as cancellation of your authorization to act on behalf of the Gussins, Purace General Partnership, Gussini Stable, or any related entity, for the purpose of executing any documents, entering into any arrangement or agreement, or attempting to secure any business as our Agent. This revocation is effective immediately.

Recognizing the agency relationship, Shockey responded by letter dated December 6, 1985, only to correct the termination date. He wrote: "In response to your letter terminating my authorization to act as your agent, I relinquished those duties on November 28, 1985...."

During the course of the agency relationship with the Gussins, Shockey assisted the Gussins in buying six or seven horses. In each case, Shockey would negotiate with the *seller* a base price above which Shockey was permitted by the seller to keep all the proceeds. Thus in September 1984 when Shockey helped the Gussins purchase a mare named "Purace," he negotiated a price of $650,000 with the seller. The seller was to receive $525,000 and agreed that all sums that Shockey could obtain above that amount he would keep as "a commission." Shockey never advised the Gussins of this arrangement; he simply told them that the price for the horse was $650,000 ($125,000 above the seller's asking price) and that they should buy it. Relying on his recommendation, the Gussins bought the horse and paid the seller, Stanley Greene, $650,000. Shockey thereafter received a check from the Elite Sales Company for $125,000 as a "commission" from Greene in connection with the Purace transaction. Shockey never disclosed having received this "commission" to the Gussins.

In a similar fashion in October 1984 the Gussins, acting on Shockey's advice and recommendation, purchased a mare by the name of "Princess Q" in foal to a stallion named "Danzig" at the time, and a foal by

her side. This "three-horse package" was purchased from Harold Walker for $850,-000. Shockey received a "commission" in an amount he could not recall from Harold Walker in connection with the plaintiffs' purchase of the Princess Q horses. Again Shockey did not disclose to the Gussins the fact that he received a "commission" from Walker.

Again in February 1985, the Gussins, acting on Shockey's advice, purchased two mares, "Past Example" and "Swift Response," in a package deal. Plaintiffs paid Harold Walker $1 million for the two horses, and Shockey received a "commission" from Walker of $400,000. Shockey did not disclose to the Gussins the fact that he received this "commission" from Walker.

Finally, in April 1985, the Gussins, acting on Shockey's advice and recommendation, purchased an unnamed foal by Forli and Past Example. Plaintiffs gave Shockey a check for $200,000 to purchase the foal. Shockey transferred $150,000 to Harold Walker and retained $50,000. Shockey did not tell the plaintiffs that he had kept $50,000.

Shockey said he did not tell the plaintiffs about the "commissions" he received from the sellers in the above transactions because "my feeling on that was the horses were undervalued and if I could buy them for one price and sell them for another then I was entitled to the middle man portion of what I thought was the true market value of the horses." Shockey stated that he "didn't feel that it was in my best interest" to tell the plaintiffs about these arrangements, and agreed that he didn't tell the Gussins about the "commissions" because he knew they would object to the commissions, and disclosing the "commissions" would have jeopardized the transactions because it meant that the Gussins had to pay a lot more money for the horses.

Shockey knew the Gussins trusted him and relied on him for advice. Nevertheless, he did not believe that his responsibilities included getting the best price for the Gussins on their purchases.

In count one of their complaint, the Gussins, individually and through their partnership, charge that the transactions violated RICO. Counts two, three, four and five allege fraud in connection with the four transactions involving respectively (1) Purace, (2) Princess Q and her foals, (3) Past Example and Swift Response, and (4) the foal of Forli–Past Example. Finally, count six charges breach of fiduciary duty.

Plaintiffs have moved for partial summary judgment, requesting that the Court enter judgment on the question of Shockey's liability on all counts and in addition specified amounts of damages on counts one, two, four, five and six.

At the hearing, plaintiffs agreed to limit the amount of damages sought by abandoning their claims for punitive damages, any amount due to them on the Princess Q transaction, and damages in excess of $575,000 which is the amount of "commissions" known to have been taken by Shockey. Counsel adopted this approach, explaining that they harbored doubts as to the ability of defendant's assets to pay any amounts exceeding a $575,000 judgment.

## II

### Breach of Fiduciary Duty

"An agency relationship is the 'fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *Federal Sav. and Loan Ins. Corp. v. Quality Inns*, 674 F.Supp. 522, 527 (D.Md.1987), aff'd in part, vacated in part, on other grounds, 876 F.2d 353 (4th Cir.1989), quoting Restatement (Second) of Agency § 1(1) (1958) (hereinafter "Restatement"). The fundamental duties of an agent include the duty of utmost loyalty and fidelity to the interests of his principal and the duty not to put himself in a position where his own interests may conflict with the interests of his principal. *See King v. Bankerd*, 303 Md. 98, 492 A.2d 608 (1985); *C–E–I–R, Inc., v. Computer Corp.*, 229 Md. 357, 183 A.2d 374 (1961). This duty includes not only the duty to act solely for the benefit of the principal on matters within the scope of his

agency but also the duty not to take advantage of his position as agent. Restatement § 387, comment b. The law presumes that the principal expects, and is entitled to expect, that the agent will use the skill and experience for which he was retained to further the interests of his principal. If the agent instead promotes his own interest at the expense of the principal's, he violates the agency relationship and is subject to liability for any loss occasioned to the principal by reason of the agent's breach. Restatement § 401. However, an agent is a fiduciary only to the extent of the subject matter of the agency. *Gay v. State Deposit Ins. Fund,* 308 Md. 707, 521 A.2d 1205 (1987); Restatement § 390, comment d.

■ If the agent is to receive any benefit from a transaction in which he is serving his principal, the agent must fully disclose any interest he has in the transaction and receive the consent of his principal to proceed, even if the principal ultimately was to benefit from the transaction. *McGinnis v. Rogers,* 262 Md. 710, 732, 279 A.2d 459 (1971).

■ In the present case, Shockey violated each of these implied duties that he owed to the Gussins as agent. In the course of making arrangements on behalf of the Gussins for the purchases of the horses, he acted to further his own interest by arranging with the sellers to receive substantial "commissions" or "kickbacks" on the sales to his principals. He concealed his practices from his principals and profited enormously from his deception. As agent for the Gussins he advised them to pay prices for horses that included a secret benefit for himself and that was in excess of the price for which he could have purchased the horses for the Gussins. He stated that he did not tell plaintiffs about his arrangements because it would not be in *his own* best interest. It is patently obvious to the Court that the defendant in this case violated the fundamental duties he owed to the plaintiffs as their agent.

The Court therefore will not permit Shockey to retain the benefits of this violation and will require that he pay to plaintiffs the $575,000 he retained as commissions. Because plaintiffs have abandoned any claim for amounts greater than this, judgment will be entered in favor of plaintiffs in this amount on count six.

### III

#### *Fraud*

Plaintiffs also seek a partial summary judgment on their fraud claims, in the amount of $125,000 on count two of the amended complaint, $400,000 on count four, and $50,000 on count five.

In *Everett v. Baltimore Gas and Electric Co.,* 307 Md. 286, 513 A.2d 882 (1986), the Maryland Court of Appeals enumerated the elements that must be proved by clear and convincing evidence in an action for fraudulent misrepresentation:

(1) that a false representation was made by [the defendant]; (2) that its falsity was known to [the defendant] or that the misrepresentation was made with such reckless indifference to truth as to impute knowledge to the [defendant]; (3) that the misrepresentation was made for the purpose of defrauding [the plaintiff]; (4) that [the plaintiff] not only relied on the misrepresentation but had the right to rely upon it with full belief in its truth, and that [the plaintiff] would not have done the thing from which the damage resulted if the misrepresentation had not been made; and (5) that [plaintiff] suffered damage directly resulting from the misrepresentation.

*Id.* at 300, 513 A.2d 882.

Defendant opposes plaintiffs' motion for partial summary judgment on the fraud counts on the grounds that (1) plaintiffs have not adequately supported their allegation that the defendant's alleged misrepresentation was made for the purpose of defrauding the plaintiff, and (2) the claim is barred by the statute of limitations.

■ When Shockey presented deals to the Gussins as ones that they should enter into, having been engaged to provide them advice on the deals, he represented falsely that the prices were the asking price and

that they were inferentially the best that Shockey could obtain. He did not disclose a large fee for himself, which inflated the price he otherwise could have obtained. These representations were false and obviously known to be false. His concessions that he did not disclose these facts because it would have "jeopardized" the transactions and because he "didn't feel that it was in [his] best interest" to do so, reveals a clear intent to give effect to his misrepresentations. The intent to defraud becomes yet more marked when consideration is taken of the facts that Shockey had twenty years experience in the horse business and knew that the plaintiffs had none and were trusting him—a trust that he violated. The law will infer the intent to defraud from these undisputed facts. The Court therefore rejects this defense.

■ Shockey also contends that the fraud claims are barred by the applicable statute of limitations. The Maryland Code provides that "[a] civil action at law shall be filed within three years from the date it accrues ..." Cts. & Jud.Proc. Art., § 5–101, Md.Code. An action accrues under this section when the plaintiff discovers the injury. *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 464 A.2d 1020 (1983). This action was commenced on October 26, 1988, and an amended complaint was filed on May 15, 1989, to add facts that plaintiffs first learned of the secret commissions through a discovery deposition conducted on April 24, 1989. Because this discovery of the fraud in 1989 is not challenged by any facts to the contrary, the limitations defense will be rejected and the claim will be found to be timely. *See Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Accordingly, the Court will enter judgment in favor of plaintiffs on counts two, four and five to the extent of $575,000 in the aggregate.

## IV

### RICO

■ The plaintiffs contend that the conduct alleged in the amended complaint and demonstrated in the record violates RICO. They rely on 18 U.S.C. § 1962(c) which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Relying on the separately alleged transactions, plaintiffs urge that the separate frauds constitute a pattern of racketeering activity. They argue that "it is clear in light of the undisputed facts ... that Shockey was 'employed by or associated with' PGP [the Partnership]," as an enterprise and that "enterprise engaged in ... interstate ... commerce" because its activities included interstate purchases and sales of horses, interstate contracts for insurance, interstate transfers of funds, and interstate arrangements for the care and breeding of the horses. They note that the definition of an "enterprise" includes a partnership. 18 U.S.C. § 1961(4).

Shockey contends that the acts complained of by the plaintiffs do not constitute predicate acts under RICO and together do not consist of a "pattern" under RICO. He also contends that the acts complained of are not the type that RICO was intended to redress.

Without addressing the issue whether the transactions in this case amount to a pattern, *see H.J. Inc. v. Northwestern Bell Telephone Co.*, —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Menasco, Inc. v. Wasserman*, 886 F.2d 681 (4th Cir. 1989), it is apparent that Shockey's relationship with an "enterprise" is not of the type required by RICO.

RICO, which was enacted with organized crime in mind, prohibits in a most general sense a defendant from (1) using a pattern of racketeering activity to obtain or control an interest in an enterprise (§§ 1962(a) and (b)) or (2) from using his association with an enterprise to carry out a pattern of racketeering activity (§ 1962(c)). In one

situation the enterprise is *the object* of the illegal conduct and in the other it is *the tool or instrumentality.*

In this case the Gussins' partnership was neither the object nor the tool. Rather it was an incidental business association of the Gussins. The record in this case shows that Shockey was the agent of the Gussins, and there is no document or testimony that he in fact worked for the partnership or used his association with it to carry out the alleged pattern of racketeering activity. The mere fact that he could be described as an agent for the Gussins who in fact were in partnership does not give rise to that relationship with an enterprise which is encompassed by RICO. Under § 1962(c) of RICO the defendant must associate with an enterprise to carry on a pattern of racketeering activity. The association must include an aspect of purpose to violate the act. In this case that cannot be said—on the contrary, the partnership here was at most an unintended victim, not a tool of violation.

■ While an enterprise may be the victim of RICO violations, *see e.g., Temple University v. Salla Bros., Inc.,* 656 F.Supp. 97 (E.D.Pa.1986), this fact alone, absent some intended nexus between the defendant and the enterprise undertaken to violate the statute, is not sufficient to engage the protections of RICO. Likewise, intent in the absence of an actual nexus between the defendant and the enterprise will not satisfy the requirements of the act. An actual nexus is shown when the defendant is associated with the enterprise and the pattern of racketeering is related to the activities of the enterprise. *See, e.g., United States v. Provenzano,* 688 F.2d 194 (3d Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982). *See also United States v. Scotto,* 641 F.2d 47, 54 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981) ("Simply committing predicate acts which are unrelated to the enterprise or one's position within it would be insufficient."). While plaintiff might be able to show a nexus in fact between the defendant and the plaintiff partnership, there is no evidence

presented to show any intent on the defendant's part to associate with the partnership for any purpose or to use it or obtain an interest in it for any purpose.

The Court will therefore deny plaintiffs' motion for summary judgment on count one and will grant defendant's earlier filed motion for summary judgment dismissing count one.

For the foregoing reasons, it is hereby ORDERED this 17th day of November, 1989, by the United States District Court for the District of Maryland, that:

1. Plaintiffs' motion for summary judgment is granted on counts two, four, five and six;

2. Defendant's motion for summary judgment is granted on count one;

3. Count three is dismissed on the request of counsel for plaintiffs;

4. Judgment shall be entered in favor of plaintiffs and against Richard Shockey in the total amount of $575,000 with costs; and

5. The Clerk is directed to enter judgment, to mail a copy of this Opinion and Order to all counsel of record, and to close this case.

## SUPPLEMENTAL OPINION AND ORDER

■ Defendant has properly brought to the attention of the Court that the Opinion and Order entered in this case on November 17, 1989, did not explicitly address and dispose of defendant's counterclaim. Defendant alleged as a counterclaim the following:

> If it is found that Richard W. Shockey, Jr. was an employee and/or agent of Frederic Gussin, Paul Gussin and the Purace General Partnership, he asserts a claim, in an as yet undetermined amount for Five percentum (5.0%) of the sales price of any horses and their offspring, whether sold publicly or privately, that plaintiffs purchased on Richard W. Shockey's advice and recommendation.

In the opinion of November 17, 1989, the Court found that Shockey was an agent of the Gussins and that implied as part of the

agency relationship the agent owed duties to his principal to be loyal, to avoid conflicts of interest, to avoid taking advantage of the agency to benefit himself, to act solely to further the interests of the principal, and to disclose interests that he may have in agency matters. The Court concluded "Shockey violated each of these implied duties that he owed to the Gussins as agent." The Court also found that Shockey made false representations with the intent to defraud the Gussins in each of the transactions complained of in the amended complaint.

Implicit in the Court's findings and decision that Shockey had violated his fiduciary duties and had perpetrated fraudulent acts on the plaintiffs is the dismissal of defendant's counterclaim. It is a long established and well grounded principle of agency law that:

> An agent is entitled to no compensation for conduct which is ... a breach of his duty of loyalty; if such conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned.

Restatement (Second) of Agency § 469 (1958); *Wadsworth v. Adams*, 138 U.S. 380, 11 S.Ct. 303, 34 L.Ed. 984 (1891). The Maryland courts have adopted this principle, stating that "an agent who is guilty of fraud upon his principal, particularly where there is a conflicting interest, concealment, or a wilful and deliberate breach of his contract, may be denied compensation for his services." *Shipley v. Meadowbrook Club*, 211 Md. 142, 148, 126 A.2d 288 (1956), citing Restatement § 469. *See also*, *Lawson v. Baltimore Paint and Chemical Corp.*, 347 F.Supp. 967 (D.Md.1972); *St. Paul at Chase Corp. v. Manufacturers Life Ins. Co.*, 262 Md. 192, 278 A.2d 12, *cert. denied*, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971).

Likewise, in *Hibline v. Prudential Oil Corp.*, 288 F. 691 (4th Cir.1923), the Fourth Circuit, applying Maryland law, held that the agent of a seller lost his right to a commission when the agent, without the seller's knowledge, arranged to receive an additional commission from the buyer. The agent was found to have a legal and moral duty of utmost good faith and loyalty to his principal, and violated these duties by attempting to serve two masters. *Id.* at 694 and authorities cited there.

For the foregoing reasons Shockey is entitled to no compensation for any services he may have rendered for the Gussins. The Court will therefore dismiss defendant's counterclaim.

Accordingly, it is hereby ORDERED this 24th day of November, 1989, by the United States District Court for the District of Maryland, that:

1. Defendant's counterclaim is dismissed with prejudice;

2. Judgment shall be entered in favor of plaintiffs and against Richard Shockey as directed in the Court's Order dated November 17, 1989; and

3. The Clerk is directed to enter judgment, to mail a copy of this Supplemental Opinion and Order to all counsel of record, and to close this case.